

**NEWS** HOME | HELP

•MEMBER SERVICES •SIGN UP
Join now!

ENTERTAINMENT | OTHER SECTIONS | CLASSIFIEDS | JOBS | CARS | HOMES | RENTALS | SHOPPING | search

ADVERTISEMENT

Now Available from California    MoneyGram
                                eMoney Transfer

January 11, 2006    latimes.com

🖶 Print    ✉ E-mail story    ● M

# Plot Thickens in the Case of the Tainted Detective

■ A former officer and a girlfriend of Anthony Pellicano plead guilty in cases linked to the investigator's suspected use of illegal wiretaps.

By Greg Krikorian, Times Staff Writer

The investigation of former Hollywood private eye Anthony Pellicano took a significant turn Tuesday with the disclosure that his onetime girlfriend and a veteran Beverly Hills police officer have pleaded guilty to lying about the detective's use of wiretaps and other illegal tactics.

The pleas by Officer Craig Stevens and Sandra Will Carradine, the ex-wife of actor Keith Carradine, offered the first confirmation in the 3-year-old federal investigation that authorities have evidence of Pellicano's long-suspected illegal use of wiretaps and confidential law enforcement records.

ADVERTISEMENT

W. P. CAREY    ✓ Flexibility
SCHOOL of BUSINESS    ✓ Opportunity
ARIZONA STATE UNIVERSITY    ✓ Results

The documents also provide the first official link between the Pellicano case and the law firm of one of Los Angeles' most prominent entertainment attorneys, Bert Fields.

The documents state that Stevens, who resigned last Friday after 24 years on the Beverly Hills force, used police computers to gather information on an individual who was battling a client of Fields' firm, Greenberg, Glusker, Fields, Claman, Machtinger & Kinsella.

Fields could not be reached for comment. His attorney, John W. Keker, denied any illegal activity by his client.

"Bert Fields is completely innocent of any wrongdoing," Keker said. "And if there is any wrongdoing involving Anthony Pellicano, he didn't have anything to do with it and certainly didn't benefit from it. And neither did anyone at Greenberg Glusker."

The firm has acknowledged that Pellicano worked on a number of its cases. On Tuesday its attorney Brian Sun said: "Neither the firm nor any of its attorneys who worked on the [Stevens] case were aware of these illegal acts or would condone such conduct if they had been aware of it."

Carradine's and Stevens' plea agreements with the government are under seal, but the deals are expected to be followed by criminal charges against other individuals — perhaps including Pellicano — by month's end, according to sources close to the investigation, who spoke on condition of anonymity because of the ongoing inquiry.

Pellicano, who is in federal prison on a separate weapons conviction, could not be reached for comment. His ~**orneys in that case declined to comment. The FBI also declined to comment, and federal prosecutor Daniel A. ders made only a brief remark about the pleas.

"Both police corruption and perjury are serious crimes that threaten the integrity of our entire system of law enforcement," Saunders said. "Neither will be tolerated in this office's pursuit of justice."



PHOTOS

MOST E-MAI
Back to Basic
Many?

Next Big Thin

Inhaled Insulir

RELATED NE
US News

Entertainment

Powered by T

TOP OF THE T

SIGN UP NO

EX. 1

The FBI's closely guarded investigation of Pellicano has riveted the entertainment industry because of his ties to the highest rungs of Hollywood and the legal community.

Pellicano, who relished his role as Hollywood's best-known PI, found himself with plenty of unwanted attention Nov. 002, when FBI agents raided his West Hollywood offices. They were searching for evidence that he had been ved in a threat against a Los Angeles Times reporter looking into one of Pellicano's former clients, actor Steven Seagal.

During their search, authorities discovered $200,000 in cash, jewelry and gold bullion, two practice grenades that had been modified to function as homemade bombs and military-grade plastic explosives known as C-4.

Months later, the 59-year-old Pellicano pleaded guilty to illegal possession of the dangerous materials and was sentenced to 30 months in federal prison.

But his problems were far from over.

During the November 2002 search of Pellicano's office and a second raid two months later, federal agents hauled away computers containing detailed bookkeeping records, wiretapping software and encrypted files of phone conversation transcripts.

Pellicano is scheduled to be released from prison Feb. 4.

The U.S. attorney's office in Los Angeles, in its statement Tuesday, said Stevens had pleaded guilty the day before to fraud for using his police position to enrich himself. Stevens, 45, of Ventura County, also pleaded guilty to illegally accessing government computers for information he sold to Pellicano and to lying about it to the FBI.

Beverly Hills police declined to comment on the case other than to say that officials had cooperated with the FBI. Neither Stevens nor his attorney could be reached for comment.

In a seven-page charging document, authorities alleged that Stevens used Beverly Hills Police Department computers to obtain confidential California Department of Motor Vehicle information on four individuals.

ces said one of the people, Aaron Russo, a former Hollywood producer and onetime gubernatorial candidate in ada, was sued in 2001 by a New York investment manager, Adam Sender, who was represented by Fields' law firm. The other three people are Russo's relatives.

Carradine, 58, pleaded guilty to lying to a federal grand jury about Pellicano wiretapping her ex-husband's home phone. At the time, the couple were fighting over child support, said her attorney, Peter Knecht. Pellicano worked on Carradine's case, and the two became romantically involved, Knecht said.

"She was, in fact, untruthful before the grand jury," Knecht said. "It was only because she was trying to protect her boyfriend." Carradine has continued to visit Pellicano in prison, he added.

While emphasizing that he has no firsthand knowledge of the government's evidence, Knecht said that Pellicano even taped his own conversations with Carradine.

"This wasn't even an important [case] ... it was only to determine where to file a civil case" for child support, Knecht said. "And soon it became clear he did everything that Richard Nixon did — he taped everyone, including himself."

Carradine, of Carpinteria, faces a maximum 10-year prison sentence and is scheduled to be sentenced in September. Stevens faces up to 35 years in federal prison and is scheduled to be sentenced in October.

———————————

*Times staff writers Chuck Philips, James Bates and Robert Welkos and research librarian Robin Mayper contributed to this report.*

Ads by Google

**ICU Investigations - $99**
Surveillance, Infidelity, Divorce
stigations Starting at $99.00
.icuinvestigations.com

**Detective Services Miami**
Civil, Infidelity, Child Custody
Phone Trace, Surveillance, Spy
Shop
www.OnlinePI.com

**Private Investigation**
Earn your Criminal Justice
Degree 100% online! Request
free info.
www.criminaljustice-degrees.com

**Criminal Justice Degrees**
Become An FBI Officer, Private
Detective & More - Request Info!
www.OnlineAIUDegrees.com

Polish Roof Collapse Kills At Least 33
Xbox Shortage Leaves Fans Out in the Cold
FDA Approves Inhalable Insulin
Judge Urges Mercy for Man He Condemned

**Site Map**

California | Local
World
Nation
Business
Sports
Travel
Editorials, Op-Ed

**Arts & Entertainment**

Columns
Education
Food
Health
Highway 1
Home
Outdoors

If you want other stories on this topic, search the Archives at latimes.com/archives.

**TMSReprints**

Article licensing and reprint options

Copyright 2006 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact Us | Site Map | Help

PARTNERS: 

# Overlawyered

ronicling the high cost of our legal system

---

« Update: "Maag's defamation suit is dismissed again" | Main | "No one is being force fed soda" »

## PELLICANO CHARGED; HOLLYWOOD LAWYERS NEXT?

Following a three-year FBI investigation (see Nov. 11, 2003), Hollywood private eye Anthony Pellicano pleaded not guilty to a 110-count federal indictment (PDF) unsealed Monday. "Pellicano, 61, is charged with organizing and masterminding a corrupt enterprise that allegedly wiretapped phones, entered private computers without authorization, committed wire fraud, bribery, identity theft and obstruction of justice." Targets of his illegal snooping are said to include celebrities Sylvester Stallone and Garry Shandling and New York Times reporter Bernard Weinraub. (Andrew Blankstein and Greg Krikorian, "Pellicano Indicted on Racketeering Charges", Los Angeles Times, Feb. 6; Roger Friedman, "Cruise, Jacko Lawyer Safe for Now", Feb. 6; AP/Hollywood Reporter).

The FBI originally got on Pellicano's trial following a bizarre 2002 incident in which a dead fish, a rose and a note that said "stop" were left on the car window of Los Angeles Times reporter Anita Busch, who was working on a story about actor Steven Seagal at the time. What has sent nervous ripples through Hollywood's legal community is that Pellicano has worked for many prominent entertainment-industry lawyers, and prosecutors are highly interested in finding out how much they knew about his alleged tactics.

> Several veteran Los Angeles lawyers who specialize in defending white-collar crime suspects said they had been retained by other attorneys who are under scrutiny in the Pellicano case.

> The lawyers all spoke on condition that they not be identified because of the sensitivity of the situation, including the possibility that some of their clients could be indicted.

> Some of them said they thought it highly likely that attorneys would be indicted in the near future.

> Asked how serious the government was about indicting certain attorneys, one defense lawyer said: "Beyond serious."

> Added the lawyer: "That dead fish led to a treasure trove of stuff."

(Greg Krikorian, Henry Weinstein and Chuck Philips, "Private Eye May Be Tried Again", Los Angeles Times, Feb. 3). More: Defamer; Luke Ford; Robert W. Welkos, "Lawyer to Celebrities Is Subject of Inquiry", L.A. Times, Feb. 7 (many persons whose privacy was allegedly infringed were on the other side of lawsuits from celebrity lawyer Bertram Fields, Pellicano's most prominent lawyer-client); Kellie Schmitt and Justin Scheck, "Hollywood PI Pleads Not Guilty to Racketeering", The Recorder, Feb. 7.

---

Posted by Walter Olson on February 7, 2006 12:08 AM | Permalink

**TRACKBACK**

rackBack URL for this entry:
ttp://overlawyered.com/cgi-bin/mt/mt-tb.cgi/1218

isted below are links to weblogs that reference Pellicano charged; Hollywood lawyers next?:

BI probing top Hollywood lawyers from Overlawyered
enforcement officials think they know why prominent private investigator Anthony ellicano was so good at turning up dirt about targets of his investigations: they say he used illegal wiretaps. A lot of highly placed... [Read More]

Tracked on February 6, 2006 10:48 PM

*Overlawyered.com* explores an American legal system that too often turns litigation into a weapon against guilty and innocent alike, erodes individual responsibility, rewards sharp practice, enriches its participants at the public's expense, and resists even modest efforts at reform and accountability.



**Blogads**

**Have a truly *legendary* party!**

Are you having a private party or corporate event and want your guests buzzing before and long after?

Try a Killing Time mystery.

Murder Mystery events for 16-30 adults. We use no actors. Your guests play all the roles, even the murderer and the victim.

*Read More...*

**Give the perfect Father?s Day gift**

Have more intelligent fights with your father.

The Economist


*EX. 2*

» Tribunes of privacy, cont'd: cell phone records from Overlawyered
Another entry in our ongoing series about how unlikely it is for the U.S. legal profession to assume a convincing pose as guardians of everyone's privacy:Attorneys are among the top omers of the controversial Web... [Read More]

cked on February 13, 2006 10:05 AM

» First lawyer indicted in Pellicano scandal from Overlawyered
And very likely not the last: "A grand jury indicted prominent Hollywood attorney Terry Christensen on Wednesday for allegedly hiring investigator Anthony Pellicano to wiretap Lisa Bonder Kerkorian, the ex-wife of billionaire and former MGM... [Read More]

Tracked on February 16, 2006 09:12 AM

» "Feds say Pellicano taped client talks" from Overlawyered
Well, this should be entertaining: "In a twist that could have many in Hollywood on edge, federal prosecutors revealed Thursday that they have taped conversations between indicted sleuth-to-the-stars Anthony Pellicano and clients who hired him... [Read More]

Tracked on February 18, 2006 09:00 AM


51 weeks of
The Economist
at 61% off the
newsstand price.
Get started
Read More...

**Is your doctor playing defense?**



Frivolous lawsuits have our healthcare on the defense.

*Personal injury lawyers are putting the blitz* on our healthcare system - from your doctors, to your hospitals, to the makers of medicines and medical devices.

*Get off the sidelines* and put an end to the lawsuit abuse games!

Read More...

**Help Restore Reliability to American Law**



COMMON GOOD™

Americans have lost faith in our system of justice: doctors practice defensive medicine; teachers have lost control of their classrooms; and employers refuse to provide honest references.

It need not be this way.

Help Common Good restore reliability to American law.
Read More...

Advertise here

**Increase** / decrease font size
(IE users)

## FREEDOM OF INFORMATION ACT FORMAL
## REQUEST FOR INFORMATION

**DATE:** June 12, 2006

**AGENCY:** National Security Agency/Central Security Service

**ADDRESS:** 9800 Savage Road

**CITY, STATE** Fort George G. Meade, MD 20755-6000


Dear Agency Officials:

As pursuant to U.S.C. 5§552 of FOIA, and U.S.C. 5§552(a) Privacy Act, I herein make a formal request for copies of all requested reasonably identifiable records as are listed in this request.


### IDENTIFYING PERSONAL INFORMATION

**NAME:** James R. Skrzypek 08324-424

**ADDRESS:** P.O. Box 1000

**CITY, STATE, ZIP:** Duluth, Mn 55814

**BIRTHDATE:** February 12, 1949

**BIRTHPLACE:** Chicago, Illinois

**SOCIAL SECURITY NUMBER:** 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

**FBI NUMBER:** Unknown

**MARSHAL'S SERVICE NUMBER:** Unknown

I am a prisoner in the Federal Prison Camp, of the Bureau of Prisons, and my funds for paying copy costs are quite limited. Recognizing the fees listed in U.S.C. 5 §552 (4)(A)(III), I request copies be made and sent to me as quickly as possible, understanding no fees will be charged if less than two hours search time, or less than 100 copies are made, as pursuant to U.S.C. 5§552(iv)(II).

If your agency requires a certain form for Freedom Of Information Act Requests, please send an official copy of said form, as the prison camp does not have access to Federal Procedural Forms L. Edition. And if said request requires notarization by your agency, please advise me as quickly as possible.

**EX.3**

### REASONABLY IDENTIFIABLE RECORD

Under The Freedom of Information Act, all agencies, as identified as such within Section 552, must make available to the public any and all records requested, with the exception of those which are exempted by agency rule and by statute. The Act is to be broadly construed in favor of disclosure and its exemptions are to be narrowly construed,

Page 2 of FOIA Request

as set forth in <u>Anderson V. Department of Health and Human Services</u>, 907 F.2d 936, C.A. 10 (Utah) 1990. The requestor has the obligation to generate a reasonable description identifying the requested record, <u>Sears V. Gottschalk</u>, 502 F.2d 122, cert denied, 98 S.Ct. 2680. However, once a record has been reasonably described and identified, and record is not exempt by statute, the agency has the responsibility to produce the requested document(s), <u>Bristol-Myers Co. V. F.T.C.</u>, 424 F.2d 935, C.A.D.C., cert denied 91 S.Ct. 46.

## REASONABLY IDENTIFIABLE RECORD(S) REQUESTED

Any and all documents, records, reports, audiotapes or videotapes, in electronic, digital, analog or in any other format in your possession, custody or control obtained, in any way, including, but not limited to, decipherd encrypted format, from Anthony Pellicano, relating, in any way, whatsoever, with James R. Skrzypek or Federal Security, Inc.

Page 3 of FOIA Request

As pursuant to 5 U.S. § 552(6)(A)(i), this agency has ten working days, not including weekends and legal holidays, to either comply with request and produce the records, or to immediately notify the requestor of the failure by the agency to comply with the request for said record(s). Should "unusual circumstances" arise in complying with this request, as pursuant to 5 U.S. § 552(6)(B), this agency is to notify the requestor of the specific date the record(s) will be dispatched. See <u>Pollack V. Department of Justice</u>, 49 F.3d 115, cert denied, 116 S.Ct. 130, 133 L.Ed. 2d 78.

I respectfully thank you for your assistance in obtaining copies of the records requested.

_____
     Requestor Signature

June 13, 2006 8:05pm

# CBS NEWS

SEARCH  ● CBS News Text ○ Videos ○ The Web

ome | U.S. | World | Politics | SciTech | Health | Entertainment | Business | Opinion | Strange News | Sports | Public Eye

e Early Show | CBS Evening News | 48 Hours | 60 Minutes | CBS Sunday Morning | Face The Nation | Up To The Minute | B

## CBS SUNDAY MORNING

Jp Next , Recap & Links    >
Program Facts    >
Bios    >
Contact Info    >
nside Scoop    >

- WIRELESS ALERTS
- E-MAIL ALERTS
- PODCASTS
- RSS - ALL FEEDS

**HOTO ESSAY**



**Celebrity Circuit**
Jennifer Aniston goes sightseeing in France, Rita Wilson opens on Broadway and Prince is named Internet king.
»

**ELATED STORIES & LINKS**

**Feds: Showbiz Private Eye Had Mob Ties**
Allege Anthony Pellicano Wanted 'Hit' On Man Who Threatened Reporter
»

**Hollywood's Biggest Scandal Ever?**
Scribe: Wiretap Case Of Ex-Private Eye To Stars Just May Be
»

**Chris Rock Tied To Wiretaps Case**
Paper Says Comedian Hired Private Eye Pellicano In Paternity Case
»

**Die Hard' Director Pleads ~lity**
McTiernan Admits False aments In Hollywood viretaps Case
»

**Hollywood Squirms Over**

> E-MAIL THIS STORY   > PRINTABLE VERSION

# Private Eye, Hollywood Spy
### What Larger Than Life Detective Anthony Pellicano Knows Scares The Stars

**LOS ANGELES, June 11, 2006**



Anthony Pellicano. (AP)

**QUOTE**

"The reason this is the investigator from hell is that he was tapping everyone. The scary things he could do to people's reputations, is limitless."

Peter Bart
editor-in-chief, Variety

**(CBS)** The hottest Hollywood drama this summer has the entertainment capital's movers and shakers on the edge of their seats.

It's the story of tough talking private eye Anthony Pellicano, a real life gum shoe who saw himself as bigger than life and bigger than anything on the big screen, reports CBS *Sunday Morning* contributor Jerry Bowen.

Pellicano is the kind of private eye Hollywood invented.

"He's like a character, very minor character in 'The Sopranos.' He's a pain in the ass," says Variety editor-in-chief Peter Bart.

Anthony Pellicano first made his name in Los Angeles helping make drug charges against automaker John DeLorean disappear even when the feds had DeLorean on tape with cocaine.

Then, after the overdose death of comedian John Belushi, Pellicano helped lawyers get reduced charges and prison time for the woman who admitted giving the fatal injection.

Playboy lionized the Chicago native as a "wizard," calling Pellicano, "America's most tenacious private detective."

And the high profile cases rolled in.

The first childhood molestation claims against Michael Jackson didn't stick after Jackson's attorney hired Pellicano to snoop around.

Comedienne Roseanne Barr used him to find the daughter she'd given up for adoption.

And comedian Chris Rock's lawyers sought Pellicano's help to fight a paternity claim.



WAL★MA


◎CBS NEV

# EX.4


Ready

**Hollywood ~**
Jerry Bowen report: possesses that has private eye landed i he claims are false.

**RELATED VIDI**
◄ Hollywood Ju

**SUNDAY MOR**
◄ A Drink To Hi
◄ Advances In M

Case 1:06-cv-01129-EGS    Document 30-2    Filed 11/22/2006    Page 10 of 22

**Upcoming Trial**
Private Eye To The Stars'
Charged With Spying On Big
Names

»

In a town of out-sized egos and incomes, Pellicano was the go-to-guy to take care of life's annoying problems.

"He is a B movie," Bart, one-time studio executive, says. "He's sort of a jerk, really."

Bart explains that people hire Pellicano for the purpose of intimidation. "He became a scary figure," Bart says.

"You could not make the Anthony Pellicano story. Nobody would believe it. Too far, too fictional, makes "The Da Vinci Code" seem absolutely dead on factual," says entertainment attorney Peter Dekom.

Pellicano actually was accused of having a dead fish and a single red rose left in a reporters car, mafia style — to scare her off a story about a celebrity client. That led cops to find grenades and plastic explosives in his office here on the sunset strip.

And then they hit the jackpot.

According to the federal indictment naming Pellicano and a dozen others on racketeering and wiretap charges, investigators found computers with thousands of hours of illegal recordings.

"The heart of the prosecution case are these 10,000 tapes that they seized from Anthony Pellicano, and initially, they couldn't even listen to the tapes. They were encrypted. They had to enlist the NSA to get the help," Laurie Levenson, a former federal prosecutor, says.

Levenson now teaches at Loyola University Law School in Los Angeles. She adds that the tapes are spearheading charges on other people and show that Pellicano was wiretapping his own clients.

The Pellicano tapes, and what and who may be on them, are making many people in L.A. nervous.

"The reason this is the investigator from hell is that he was tapping everyone," Peter Bart says. "The scary things he could do to people's reputations, is limitless."

Powerhouse Hollywood attorney Bert Fields, with clients like Tom Cruise and Stephen Spielberg, used Pellicano extensively and has admitted he was brought in for questioning.

Also questioned was former super-agent Michael Ovitz, who reportedly hired Pellicano to investigate people badmouthing him.

Among the scores of victims named in the indictment: celebrities Garry Shandling, Keith Carradine and Sylvester Stallone were targets of Pellicano's wiretaps and illegal background checks.

And among Pellicano's alleged accomplices: two cops, a telephone worker, and a computer whiz. Also nailed, but pleading not guilty, is big-shot attorney terry Christensen, who allegedly used Pellicano wiretaps in a multi-million-dollar divorce case. High-profile divorce investigations were a Pellicano specialty.

This is something Jude Green knows well.

"You're going to be followed. You cannot talk on your telephone without wondering who's listening. You cannot speak confidentially to your attorney because your phone is probably listened to, at home, and on your cell," Green, who was embroiled in a messy divorce with her multimillionaire financier husband. "Your personal information is no longer your personal information. "You cannot put your garbage away. You cannot function as a normal human being anymore."

When the marriage failed, the divorce was ugly and Pellicano appeared in the flesh.

Green recalls a day when a stranger pulled up in a Mercedes and cornered her.

▪ Hi-Tech Parkin

▪ Summer Read

**TOP VIDEOS**

▪ A Perversion

▪ Bush Makes S

▪ Inside The Su

▪ Dealing With I

Adve

**Save on All Your**
Save 50% on your l
distance - $24.99/m
www.vonage.com

**Bad Credit Refina**
Up to 4 quotes with
please.
www.nextag.com

**Homeowners - Do**
$145,000 mortgage
rates are still low.
www.lowermybills.c

"And he gave me this look and folded his arms and stood there," Green says. "The menacing, bullying tactic. The body language said everything." The real mystery is why intelligent people would risk everything by employing someone who was known for bending, if not breaking the law.

Why are people who are making $10, $15, $20 million a year practicing celebrity law, why would they jeopardize their reputations? Do you realize how profoundly stupid that is?," Bart says, adding, "and that's the big question in my mind. How could these people be that arrogant or that stupid?"

Levenson, the law professor, says it's a classic case of situational ethics.

"I think lawyers want to win too much. And that's what happened here. You have lawyers who wanted to win, and Anthony Pellicano was bringing them the goods, bringing them the information that they could use to win and find out about the other side's case.

"In the Hollywood culture, it's the idea that, you know, we don't really have to play by the same rules. We represent the stars, and whatever the stars need, we're going to get for them, regardless of the rules."

But now there may be Hollywood's version of hell to pay. Divorces, movie deals, celebrity contracts tainted by Pellicano's handiwork may all be undone.

"A lot of people are going to be bankrupt and that's one tip of many icebergs," Dekom says. "Another iceberg that's drifting down by the arctic circle is what happens to those cases that were decided based on evidence that was obtained through illicit means? Are all those cases going to get thrown out, and the answer is maybe."

Pellicano is scheduled to go on trial in October. But with prosecutors saying there will be more indictments, it's looking like a long hot summer in Hollywood.

©MMVI, CBS Broadcasting Inc. All Rights Reserved.

**INSIDE SUNDAY MORNING**



**Private Eye, Hollywood Spy**
What Larger Than Life Detective Anthony Pellicano Knows Scares The Stars

• Billy Joel's Fine Just The Way He Is
• The Medical Frontlines Of War
• 'I Am Who I Am'
• **More**

**TOP STORIES**

• Bush Trip Aims For Secrecy, Security
• Sudanese Clinic Fights To Stay Open
• Is Rove Through With Libby Trial?
• 2 Diabetes Drugs May Lower Blood Sugar

**MOST POPULAR STORIES**

• Poll: Zarqawi Death Has Little Impact
• Doctors: Steelers QB May Play In '06
• Couple Describes Oprah Shocker
• Redford To Democrats: Show Backbone

⌃ Back To Top

reless Alerts: CBS News To Go  E-Mail Sign-Up: Breaking News | Today On CBS News | 60 Minutes | 48 Hours | The Early Show | CBS Sund

commended Sites: CBS Corporation | The ShowBuzz | CBS.com | CBS SportsLine | UPN.com | CBS Store | CBS Careers | CBS Cares

e Map | Video Site Map | Help | Advertise | Contact Us | Terms of Service | Privacy Policy | CBS Bios | Internships

**CBS NEWS**     SEARCH  ● CBS News Text ○ Videos ○ The Web

MVI, CBS Broadcasting Inc. All Rights Reserved.

//www.cbsnews.com/stories/2006/06/11/sunday/main1699525.shtml                                    6/13/2006

ANNALS OF COMMUNICATIONS

# HOLLYWOOD ENDING

*Can a wiretap scandal bring down L.A.'s scariest lawyer?*

### BY KEN AULETTA

Bertram Fields, who has a reputation as the most feared lawyer in Hollywood, does not often do lunch. He prefers to be driven in his Bentley Arnage from his law office, in Century City, to his Cape Cod-style home, in Malibu, where he prepares a salad, takes a twenty-minute nap, and has time to think—what he calls *"wa* time" ("It's a Japanese expression meaning peacefulness of spirit," he explains)—before returning to the city. But on a sunny day in April he agreed to meet at Spago, in the heart of Beverly Hills. This was particularly unexpected because, in the past several months, Fields has been the subject of much curiosity in Hollywood, where many believe that he is the central target of federal prosecutors in a wiretapping scandal that has obsessed the city. So, as Fields, a trim seventy-seven-year-old, walked swiftly to an outdoor table, people stared.

In nearly half a century, Fields has represented almost every studio head and some of Hollywood's biggest stars, including Tom Cruise, Michael Jackson, Warren Beatty, the Beatles, John Travolta, Madonna, Mike Nichols, and Dustin Hoffman. He has also represented Rupert Murdoch, the chairman of News Corp., and Steven Spielberg, David Geffen, and Jeffrey Katzenberg, the co-founders of DreamWorks SKG. His unwritten calling card says, not wholly accurately, "Bert Fields has never lost a court case." He has played much the same role in L.A. that the late Edward Bennett Williams did in Washington: clients come to him in the belief that, through skill or intimidation, he will make their legal problems vanish.

At Spago, Fields ordered a glass of Chardonnay and a Greek salad with chicken, which he ate very little of. Wolfgang Puck, the chef-owner, lingered at Fields's table as he made the rounds. Half-glasses perched on the tip of his nose, Fields explained his approach to the law: "If I were a general, I would attack, and keep pressing the attack—to throw the opponent off balance, to change the odds and make a settlement your way much more favorable." When you attack, he says, "it forces the other side to think, Hey, I may lose this case. Let's settle it." But lately Fields has been following the advice of his own attorney, and has barely spoken to the press or gone on the attack.

Fields's connection to what may turn out to be the biggest, and dirtiest, scandal in Hollywood's history is Anthony Pellicano, a rough-edged private detective whose involvement with Fields started some twenty years ago, and who is now in jail. Pellicano's troubles began where many Mafia tales end: with a dead fish. In this case, the fish appeared, in June of 2002, on the windshield of the Los Angeles *Times* reporter Anita Busch's silver Audi. The windshield was cracked; a rose was in the fish's mouth, and a cardboard sign saying "Stop" had been placed over the glass. Busch had done a series of investigative stories about the movie industry, focussing on the former superagent Michael Ovitz; she was working on a story alleging that Mob money might have financed a Steven Seagal movie. Over the next few months, Busch told police, her parents felt threatened, her phone was tapped, her computer was hacked into, and someone tried to run her down. F.B.I. investigators later told her they believed that her chief pursuer was Pellicano.

In November, 2002, five months after the fish was found on the windshield, the F.B.I. obtained search warrants for Pellicano's office, and in his safe agents discovered explosives, two hand

*Bertram Fields in Malibu. "Winning is one of his defining characteristics," his son says. "He must do the best he can to beat the other guy." Photograph by Martin Schoeller.*

EX.5

grenades, loaded pistols, and bundles of cash totalling about two hundred thousand dollars. After an investigation by the United States Attorney in Los Angeles, Pellicano pleaded guilty to illegal weapons possession, and in February, 2004, was sentenced to thirty months in prison. But the most significant discovery in Pellicano's office was said to be hundreds of hours of encrypted, illegally wiretapped conversations, and in February of this year Pellicano was indicted, along with six associates, on charges that included racketeering, wiretapping, bribery, destroying evidence, and perjury.

The federal indictment, which now lists a hundred and twelve counts, names many of the people who were wiretapped or under surveillance by Pellicano. The indictment doesn't identify any of his clients, but it is known that they included Ovitz; Brad Grey, the head of Paramount; and Ron Meyer, the president of Universal Studios, who, with Ovitz, was a founder of the powerful Creative Artists Agency. It is also known that no one used Pellicano more frequently than Fields and his law firm, and that puzzles even friends and former clients, like Jeffrey Katzenberg, who told me, "I cannot reconcile the Bert I know having anything to do with Pellicano."

This spring, the U.S. Attorney seemed to be circling Fields—"the biggest name in town," in the words of Laurie L. Levenson, a Loyola Law School professor and a former Assistant U.S. Attorney in Los Angeles. He is, she said, "sort of the giant in the field," which makes him "much more" of a target.

Bert Fields has many talents besides the law. He has written two mystery novels, under the pseudonym D. Kincaid; a book about Shakespeare ("Players"), in which he posits the theory that Shakespeare had a secret writing partner, probably the Earl of Oxford; and "Royal Blood," a revisionist study of Richard III. He is completing a biography of Elizabeth I. Fields is a rarity among entertainment lawyers because he also litigates, and his pugnacity frightens opponents. One Fields client says, "If he's on the other side, he's a nightmare. He's going to make your life miserable. Someone who actually enjoys beating people up, there's something wrong with them. But when you hire a litigator you want a prick." This quality is especially reassuring to clients who, as the producer and writer Norman Lear puts it, have a "need for adulation." John Calley, who has run three Hollywood studios, and who produced "The Da Vinci Code" for Sony, says of the helping professions—the agents, managers, publicists, and lawyers who work for Hollywood's biggest names—that "it is in your interest to be able to seem to protect them from anything."

The indictment of Anthony Pellicano is essentially about the use and misuse of information. The private eye, it states, was hired "for the purpose of implementing illegal wiretaps," and he shared the information he got with clients, who gained "a tactical advantage in litigation by learning their opponents' plans, strategies, perceived strengths and weaknesses, settlement positions and other confidential information." Clients also gained "personal information of a confidential, embarrassing, or incriminating nature regarding other individuals."

It is not unreasonable to suggest that seeking this sort of advantage is central to life in L.A. Doug Ellin, the creator and executive producer of HBO's satirical "Entourage," says that Hollywood is motivated in large measure by "the power of knowing things before others do. The best thing you can do as an agent is tell your client something before someone else does." Peter Bart, the editor-in-chief of *Variety*, who was once a top executive at Paramount, recalls, "In 1970, I was suspicious that our phones at Paramount



HILDA SINGS "THE DEMOCRATIC BLUES"

Skirt made in Nepal-money goes to women in Nepal!

Pottery lamp made in Ecuador-money goes to fund Ecuadorean babies!

Oh, I drive a hybrid car,
(bam-buh-bam-bam-bam)
I listen to NPR,
(bam-buh-bam-bam-bam)
I feel real bad 'bout lots of stuff,
(bam-buh-bam-bam-bam)
Wonder, do I do enough?
(bam-buh-bam-bam-bam)
My party always seems to lose -
(bam-buh-bam-bam-bam)
I got them Democratic blues.
(bam-buh-bam-bam-bam)

were tapped. I was right." To this day, studio heads and agents often fail to announce that a secretary is listening to their phone calls and taking notes. "What did Mike Ovitz call his agents? Soldiers," Colin Callender, the president of HBO Films, says. "It's a war out there." Or at least it's thought to be, he says, by too many people.

In Fields's novels, his alter ego, an attorney named Harry Cain, relies on a disreputable private investigator to retrieve information. In real life, P.I.s locate witnesses, discover discrepancies in a résumé or in evidence, do background checks on companies or individuals, and discourage stalkers. "You want to find out, if someone is suing your client, do they have a record of arrests?" Fields told me in the course of four interviews. "Do they have a record of immoral behavior? Have they been in litigation a lot? Sometimes you say, 'I want surveillance on the opponent—follow him.'" He added, "Without question, tapping someone's phone line is not legitimate and proper." In his novels, though, the private eye seems to obtain some information from wiretaps.

Fields first hired Pellicano in 1989, at the recommendation of the producer Don Simpson, whom Fields was defending against a sexual-harassment suit brought by a former assistant. Pellicano uncovered information about Simpson's accuser, including the fact that she had hired a male stripper for a party. Instead of addressing her charges, Fields questioned her character and credibility, and the revelations helped to get the case dismissed.

By that time, Pellicano was well known in Hollywood. In the early nineteen-eighties, he moved from Chicago to Los Angeles, where the attorney Howard Weitzman hired him to help defend John Z. DeLorean, the auto executive, who was charged with selling cocaine to finance his business. (Pellicano's information was used to challenge the accounts of prosecution witnesses; DeLorean was acquitted.) Roseanne Barr paid Pellicano to find a daughter she had put up for adoption, and his clients eventually included Simpson, Sylvester Stallone, Kevin Costner, and James Woods. Fields called on Pellicano again in the early nineteen-nineties, when George Harrison was receiving threatening let-

ters from someone on the East Coast. Fields says that Pellicano found the letter writer within forty-eight hours. "It stopped," he told me. "I thought it was extraordinary. It was one of the reasons that I used him after that."

Fields had been recommended to Michael Jackson by David Geffen and Sandy Gallin, Jackson's manager, in 1990, and in 1993, when Jackson faced charges of child molestation, Fields recommended Weitzman and Johnnie Cochran as criminal-defense lawyers. He also brought in Pellicano, who unearthed embarrassing information about the family of the thirteen-year-old accuser; the family and Jackson eventually reached a settlement.

Pellicano became a recurring character in L.A. newspaper stories, and appeared to enjoy the attention. An unsmiling, burly man of medium height with a pasty complexion and slicked-back, thinning gray hair, he wore tailored double-breasted suits, patent-leather shoes, and sunglasses, chewed Chiclets, and volunteered very little. He had more than once brandished a baseball bat, and when callers to his office were placed on hold they heard music from "The Godfather." "I always start out by being a gentleman," he liked to say. "I only use intimidation and fear when I absolutely have to." One Christmas, Pellicano sent out baseball paperweights with the inscription "Sometimes … you just have to play hardball."

Pellicano made *Entertainment Weekly*'s 1993 annual Hollywood power list, ranking ninety-sixth out of a hundred. He often appeared as an expert witness, particularly as someone who could decipher tape recordings. In 1996, Steven Gruel, as an Assistant U.S. Attorney, used Pellicano as an independent expert to authenticate F.B.I. evidence. "He was the best witness I ever had," says Gruel, who last year went into private practice in San Francisco and today is Pellicano's lawyer. Pellicano even interested HBO in a series based on his work as a private investigator. He enlisted the director William Friedkin and the head of the William Morris agency, Jim Wiatt, who persuaded Brad Grey, the executive pro-

ducer of "The Sopranos," to take the idea to HBO, which eventually decided against developing it.

Over the years, Pellicano's relationship with Fields became increasingly close. When Pellicano celebrated his fiftieth birthday, in 1994, in Las Vegas, Fields and his wife, the art consultant Barbara Guggenheim, were among the guests. One could imagine that Guggenheim, the daughter of a dress-shop owner in Woodbury, New Jersey, who has a Ph.D. in art history from Columbia, was not entirely comfortable in those surroundings, but she still affectionately refers to "Anthony." Attending was a matter of loyalty, Fields told me: "He was a guy who was sort of appealing in the sense that he was struggling to make a living and was very good at his job."

Pellicano, who has been married five times and has nine children, was driven by family pressures to cultivate new business. Harland W. Braun, a criminal-defense attorney, told me that when Pellicano first came to town he called "and implied that he was connected with the Chicago Mafia." Braun went on, "He also acted as if he were connected to law enforcement. He'd leave a message on the answering machine: 'If you don't call me back, I'm going to have the Beverly Hills police arrest your client.'" The lawyer Pierce O'Donnell remembers thinking, after Pellicano visited him in his office, "He'd do whatever he needed to do to satisfy the needs of the lawyer or the client."

It was no secret that Pellicano's past was disreputable (in 1976, he was forced to resign from the Illinois Law Enforcement Commission after reports that he took a thirty-thousand-dollar loan from the son of an Illinois mobster) and that his methods could be rough. In 1993, a front-page story in the Los Angeles *Times* exposed Pellicano's alleged Mob links in Illinois and the way he sometimes physically intimidated those he investigated; he promised clients that he would "make their tormentors 'remember why they're afraid of the dark.'" Other press accounts in the nineties included the sus-



*"You were really great out there!"*

picion that Pellicano wiretapped on behalf of his clients. Adam Dawson, a Los Angeles private investigator, says that most of the criminal attorneys he works for "wouldn't touch" Pellicano, because "they felt uncomfortable" with him.

When I suggested to Fields that even his friends were puzzled by his association with the detective (I used the word "thug"), Fields replied slowly, saying, "I never knew him as a thug. I never saw an instance of Anthony hurting anybody or really threatening anybody." As for the *Times* story about his Illinois Mob ties, Fields said, "I'm not sure I read it," and he said that he didn't recall ever seeing a bill from Pellicano or asking for an explanation of his charges. He explained that Pellicano probably called his assistant and "told her to send the bill to the client." Of all the investigators he retained, Fields added, Pellicano was the best. "He came up with stuff that other people didn't. He did that over and over again. He was just better. . . . I don't know how he did it. It certainly wasn't wiretapping." Fields's law partner Bonnie E. Eskenazi says that Pellicano did not tell her and Fields how he retrieved his often "fantastic" information. "And I didn't tell him how I practice law." Eskenazi also said, "Anthony reminded me of some of my dad's friends on Long Island. A lot of my dad's friends would talk big on the outside but be soft on the inside."

Fields has been under intense scrutiny in the three years since Pellicano's conviction on the weapons charge; he was interviewed by F.B.I. agents in the spring of 2003. Yet Fields's life—outwardly, at least—doesn't seem to have changed much. His only child, James, a New York investment banker, says, "He's not going to let what's going on affect him." Fields and Guggenheim still get up at 5:30 A.M. and read the newspapers. Fields rarely eats breakfast, but if he's hungry, Guggenheim says, he sometimes pours a Diet Coke over a bowl of cereal. At the end of the day, they relax with a glass of wine, and he will often prepare an incendiary Mexican dinner.

At the ninety-lawyer firm of Greenberg, Glusker, Fields, Claman & Machtinger, Fields's office occupies a corner on a high floor with panoramic views of Los Angeles. Papers are piled on his desk, and cartons of transcripts litter the floor. Clients, who pay nine hundred dollars an hour, enter through a confer-

ence room darkened by closed walnut shutters and a deep-burgundy rug, which convey the sort of intimacy one associates with a psychiatrist's office. Fields is a practiced listener. An air of informality is heightened when, almost like Mr. Rogers, Fields removes his suit jacket and puts on a cardigan. His office décor includes an oil painting of George Washington, a woodcut of a Japanese samurai, and a bronze bust of the matador Manolete, who was fatally gored by a bull in 1947. Fields has it as a reminder, he says, that he wants to get "closer and closer to the horns of the bull. You get a kick out of defying fate."

Fields's manner is reserved and gentlemanly, but not avuncular; he offers no pats on the back, no jokes, no gossipy digressions. His graying black hair is neatly trimmed and he appears to be extremely fit. "Because he's always very calm, you never, ever feel in your professional dealings with him that he's not in control," the retired agent Sue Mengers says. "The first time I hired him, I had never had a lawyer. Everyone was saying, 'It's time you stopped negotiating your own deals.' I was like a pussy. The reason I went to Bert Fields was that so many powerful guys knocked him. If they hated him so much, I figured that was the guy I wanted."

Fields likes to make surprise attacks. He launched one against Barbara Chase-Riboud in 1997, after she filed a ten-million-dollar lawsuit accusing DreamWorks of using material from "Echo of Lions," a novel that she published in 1989, for "Amistad," a movie directed by Steven Spielberg. Chase-Riboud demanded a screen credit and a payment (which she called "reparation") and asked that her book be brought back into print. Appearing on CNN with Chase-Riboud, Fields said, "We have looked at another book she wrote"—her 1994 novel "The President's Daughter." "We found a passage that is identical to an earlier book."

"So you're claiming that Barbara is a plagiarist?" the CNN anchor, Mercedes Woods, asked.

"I'm not using the word."

"That's what you're claiming." Woods insisted.

Pierce O'Donnell, whose firm represented Chase-Riboud, and who is a

friend of Fields, says, "I took him to task privately afterward. I thought he was a little rough on Barbara." Fields explains, "You have to draw a distinction between what I will say to the press and what I would say in court. When I'm talking to the press, I may be much more dramatic." A court, on the other hand, "is a temple." (The two sides settled out of court.)

Fields is known for sending letters hinting at legal action if the recipient does not alter course. When he learned that the New York *Post's* Page Six was preparing an item on Spielberg and Tom Cruise, he wrote to the editor:

We have received word that you are planning a report that Steven Spielberg was upset with Tom about Tom's speaking out about his views on children's use of drugs . . . and that now they are not speaking to each other. . . . Each of these statements is absolutely and demonstrably false. Steven is not upset with Tom. . . . Tom and Steven remain close friends and are looking forward to working together again.

Nevertheless, Page Six reported that Spielberg was furious with Cruise because, during a promotion tour for their movie "War of the Worlds," Cruise had been "ranting" against "the widespread use of Ritalin to treat unruly children diagnosed with Attention Deficit Disorder." Spielberg was reportedly upset because he knew children for whom "Ritalin does a lot of good," and because Cruise, who is a Scientologist, "played up Scientology more than the movie during press interviews."

According to two close friends of Spielberg's, Page Six was accurate, although the item did not note the real source of Spielberg's anger: after he mentioned to Cruise the name of a doctor—a friend—who prescribed Ritalin, the doctor's office was picketed by Scientologists. When I asked Fields if Cruise had revealed the name of Spielberg's friend to Scientologists, he said only, "I wouldn't have said what I said without checking with Tom. I don't know that I talked to Steven, who I've represented."

In a courtroom, Fields never raises his voice. "A jury doesn't want some guy shouting at them," he says. "Even when you think the other side is a scumbag—it doesn't win you points." He has sometimes listened to John Philip Sousa marches before heading to court. "They

get me fired up," he once told his friend Mel Brooks.

Fields's courtroom tactics were apparent in 1999 in the case he brought against the Walt Disney Company on behalf of Jeffrey Katzenberg. In 1994, Katzenberg was forced out as chairman of Disney's movie division, and he later sued Disney for more than two hundred and fifty million dollars in bonuses that he said were due under his contract. Disney did not dispute that Katzenberg was owed something—he had already received severance payments totalling a hundred and seventeen million dollars—but Fields argued that Disney's chairman, Michael Eisner, had arrived at the lower figure solely because of personal animus toward Katzenberg.

Fields and Eisner had been on opposing sides in court more than once and obviously were not fond of one another. At one point, Eisner had let it be known that Disney would not do business with anyone who retained Fields (the edict was soon rescinded). Fields had publicly boasted that he had represented every studio but Disney; when, in 1998, Eisner hired a new counsel, Fields wrote to Eisner, "I want to congratulate you on the selection of Lou Meisinger as your new General Counsel. Lou is a man of extraordinary skill, intelligence, and judgment. Every once in a while you do something right."

At the Katzenberg trial, with Eisner on the witness stand, Fields bore in, re-

ferring to conversations between Eisner and the co-author of his 1998 autobiography, Tony Schwartz:

Q: Did you tell Mr. Schwartz that you hated Mr. Katzenberg?

A: In one conversation when he pushed me on a series of things that Mr. Katzenberg had done, I did—I did say that.

Q: You said, "I think I hate the little midget"?

A: I think you're getting into an area that—that—I just want to say that is ill-advised . . . and if you pursue this line of questioning, it will put in the public record those things that I think are not necessary to be in the public record.

Q: And did you say to Mr. Schwartz, "I don't care what he thinks, I am not going to pay him any of the money"?

A: I would say again, in anger I said that.

Soon after Eisner's testimony, the company agreed to pay Katzenberg more than two hundred and fifty million dollars—at the time, according to *Variety,* "more than triple the amount ever given to an individual" in a Hollywood lawsuit. Katzenberg recounted for me how Fields prepared him for cross-examination: "He'd say to me, 'A great wordsmith, a great interrogator, a really great litigator, can get a witness to say what he wants him to say.' He would do an exercise with me in which he would tell me that he was going to get me to admit to jay-walking yesterday—something I hadn't done. He then proceeded to get me to admit it was at least possible I might have done it. He managed to get Michael Eisner to threaten him from the stand."

Although Fields encourages the im-



Are you kids just going to drift all summer, or do you think you might actually sting something?

PORTUGUESE MOM OF WAR

pression that he has never lost a case, the assertion is dubious. He estimates that ninety per cent of his cases are settled before they go to trial—"Otherwise, I'd be in court every day"—but not all are settled in his clients' favor. For instance, he represented Madonna when, in 2004, she and the Maverick Recording Company, which she co-owned, brought a breach-of-contract suit against Warner Music. Fields sought two hundred million dollars and settled for ten million.

An attorney who has been both an ally and an opponent of Fields in court thinks that Fields's aggressiveness "so pumps him up that sometimes he takes noisy public positions that make it hard for him to easily extricate himself without losing face." In Hollywood, where entertainment lawyers often have clients on both sides of the table, a lawyer typically seeks what is referred to as "a win-win situation." Susan Estrich, who teaches law at the University of Southern California and is a family friend, says, "His attitude is you protect your client. Bert doesn't play social games. He's not out schmoozing. There's no legal, legitimate, ethical tactic he won't use to protect you." Some people, including Fields's friends, believe that this sort of determination is what propelled him to hire Pellicano.

In June, in his first press interview in three years, Pellicano told the Los Angeles *Times* that Fields was "Mr. Straight Arrow. My God, I don't think I've even heard him curse in the entire time I've known him—let alone say, 'Hey, Pellicano, I want you to go out and do this or do that.' " Yet even some of Fields's friends believe that he either knew the private detective's methods or deliberately avoided knowing. Fields used to say of Pellicano, "I got my guy on it," one prominent friend recalls, adding, "It appeals to those in show business to talk about a Pellicano as if he had 'connections' or extra-special power." In Fields's most recent novel, "The Lawyer's Tale," Harry Cain asks his private eye to dig up dirt on an opponent. Harry "didn't want to commit extortion if he could avoid it,"

Fields writes. "But he had to get a message to [the opponent] that would change his mind."

Bertram Harris Fields was born on March 31, 1929, the only child of Mildred Arlyn Ruben, a former ballet dancer who read the *Wall Street Journal* and the *Daily Worker*, and Maxwell Fields, an eye surgeon in Los Angeles whose patients included Groucho Marx and Mae West. His mother, Fields says, "had a fierceness in her. She felt strongly about ideas. She was not a person who easily saw the other side of an idea." His father, who in his early forties abandoned his practice to join the Army—a decision that Fields still recalls with reverence—was "very articulate, very rational," Field says, and he believes that he was shaped by that as well as by his mother's fiery stubbornness.

His parents fought—"He was not faithful. She knew it," Fields says—and, at the age of eight, Bert was sent to live with an aunt in San Francisco for six months. In high school, while his father, still in the service, was based in Las Vegas, he was sent back to Los Angeles to live in a boarding house. "I earned money as a caddy," Fields remembers. "I pressed my own pants and shirts. I was poor. It made me more independent than I might have been. It made me perhaps yearn for family more. Those were very lonely times." He enrolled at U.C.L.A. His father wanted him to be a doctor, but he decided to be a lawyer and was accepted at Harvard Law School. After graduation, he married Amy Markson, a college sweetheart, and joined the faculty of Stanford Law School, hoping to avoid military service. In 1953, when he lost his deferment because of the Korean War, he volunteered for the Air Force. For the next two years, he served as a prosecutor and a defender in the Judge Advocates Division. In 1955, the year that James was born, Fields went to work as a litigator for a Beverly Hills law firm, where he was asked to handle the divorce of a fashion model, Lydia Menovich, a five-foot-eight-inch beauty. Friends saw Lydia as an unpretentious Auntie Mame character; when she met Mel Brooks,

she badgered him to marry her best friend, Anne Bancroft. Fields fell in love with his client, and they were married in 1960, two years after they met.

Fields did a little acting, appearing in an episode of "Dragnet" when his client Jack Webb cast him as a prosecutor. He became the lawyer for celebrities like Jeanette McDonald and the producer Mike Todd and performers like Peter Falk and Elaine May. Some of his cases have become part of Hollywood lore—for instance, Edward G. Robinson's divorce, in which there was an impasse over a collection of Impressionist art that Robinson wanted to sell and that his wife wanted to keep. Fields arranged for the Los Angeles County Museum to take the paintings on loan, and to remove them late at night. "We had the idea that if we could get the paintings out of the house, she would finally relent and allow Eddie to sell the collection," Fields recalls. In the end, she gave in.

Fields formed an important alliance in this period with Michael Ovitz. "When I started C.A.A., in 1974," Ovitz recalls, "I asked friends of mine who the meanest and nastiest litigators are in L.A.—who do I have to look out for? Two names came back." One of them was Fields. Recalling their first meeting, Fields says, "I found him very bright." After the meeting, Ovitz told Fields, "I'd like to pay you one dollar a year not to sue me." Over the years, Fields sent clients like Dustin Hoffman to Ovitz, and Ovitz directed clients to Fields. Until 1995, Ovitz says, when he left the agency business to become a Disney executive, "we probably talked two, three times a week."

If one case established the Fields "brand"—the idea, as David Geffen put it, that "your lawyer will do anything for you"—it was the fate of Elaine May's movie "Mikey and Nicky," in the mid-seventies. Paramount insisted that the film was late, and that May was in violation of her contract and had to turn over the movie. Fields countered that Paramount had granted an extension and that May had "final cut." A court ordered May to give up the work print to the studio, but the only extant copy had mysteriously disappeared. May and Fields professed ignorance about its whereabouts.

But certain facts could not be expunged from the record: The day before

the print vanished, Fields telephoned May, who was in New York, and urged her to give the editing staff the day off; and he told her to ask no questions and leave town for the day. Then, just about the time that the print went missing, Fields, who was also in New York, got on a plane back to Los Angeles. The studio charged that Fields and May were in contempt of the court order, but any delay meant added expense, and Fields made an offer: If the negative were to reappear, and May was allowed to make her final cut, perhaps the studio would drop the case? As for what actually happened, Fields says, "I will not go into who did what." May says, "He was what you always thought Perry Mason was. He did everything, and he did it without pay because I had no money. I paid him, finally, a year later, but he didn't know I would."

The director Mike Nichols speaks of Fields as if he represented the dispossessed: "Here's why so many people love Bert. He took the side of Elaine versus a gigantic studio. Unlike a lot of people in Hollywood, he chose Elaine. She had nothing but her talent—and being very cute! He has often been a champion of the weaker. He's not in the back pocket of the studios or anyone."



*"Some fresh-ground soot for your salad, sir?"*

Fields says that most of the cases and events depicted in his novels are true. In "The Lawyer's Tale," published in 1992, Harry Cain's wife dies of cancer. Lydia—Fields's "soul mate," as his son describes her—had died of lung cancer in 1986. For nearly two years, Fields was consumed by the effort to save her life. Ovitz, who was the chairman of the board of the U.C.L.A. Medical Center, persuaded the dean of the medical school to oversee Lydia's treatment. Fields recalls that his friend and client Warren Beatty, a famous hypochondriac and amateur medical expert, became like "another doctor." Fields still keeps Lydia's ashes and photographs of her at an apartment he has in West Hollywood Hills.

For the next five years, Fields spent much of his free time with Beatty, who was not then married. "Warren did something for Bert none of us with families could do," Ovitz says. "He hung out with him." Ovitz had tried to set up Fields with his close friend Barbara

Guggenheim, who had worked as an art consultant for Ovitz and for Hollywood clients like Ray Stark, Candy and Aaron Spelling, and Sylvester Stallone. Fields, who disliked blind dates, didn't call her, but business brought them together in 1989, when Stallone sued Guggenheim, for five million dollars, for urging him to buy a painting by the nineteenth-century French artist William-Adolphe Bouguereau that he later contended had been damaged and restored. Guggenheim, a slim, tall woman who has silver-gray hair pulled back in a ponytail, had dated a succession of men but never married. She met Fields in New York in January, 1990, and they were married in 1991. Like Lydia, Barbara became her husband's sole confidante. "Bert's not close to anyone particularly," Guggenheim told me. "He's always more comfortable talking to me than to men about personal stuff. He's not interested in golfing with the boys or taking white-water-rafting trips." She says that she understands why he still cries when he thinks about his second wife, and why he keeps her ashes. "He wouldn't have been who he is without her," she says and adds, with a smile, "He's a well-trained husband. I'm grateful." The Stallone lawsuit was settled soon after

Fields let it be known that the actor would face a brutal cross-examination—with the implication that it would embarrass Stallone. "She didn't pay a dime!" Fields told me.

Fields and Guggenheim have five homes—in L.A., New York, Mexico, and France. Some old friends believe that Fields became more status-conscious after he met Guggenheim. They point to the Bentley Amage, which cost almost a quarter of a million dollars; to the fact that both have had cosmetic surgery; and to their posing in formal dress on the beach in Malibu for a 1993 profile in *Vanity Fair*. (Two muscular young men hold a golden frame, and in the center of the frame Bert is dropping to one knee and kissing Barbara's hand.) Fields's office contains no trophies from past battles, no autographed pictures from celebrity clients, but his novels burst with self-satisfaction. In "Final Verdict," his first novel, a grateful client says about Harry Cain, "Harry, I'll never forget it, never forget what you've done for me. Fucking, stinking genius, the greatest fucking genius in the world. You can take your Ed fucking Williams and your Mel fucking Belli and shove 'em."

James Fields, who is a senior managing director at the Blackstone Group in



S. GROSS

New York, says of his father, "Winning is one of his defining characteristics. He must do the best he can to beat the other guy. Everything is him versus the opposition, a chess match." Barbara Guggenheim adds, "He started playing tennis at the age of sixty with me. If you look at tennis as a metaphor for life, he dives for every ball. I've taken him to the hospital with injuries." In "The Lawyer's Tale," Fields describes on different occasions how Harry Cain feels after a victory. He feels "the incomparable high of winning"; and again, "the incomparable high of winning"; then the desire for "winning one more time"; "the orgasmic thrill of winning"; and, finally, the "feverish hunger to win."

Three years ago, federal prosecutors informed Bert Fields that he was "a subject" of their widening investigation in the Pellicano wiretap case. According to Justice Department guidelines, "a subject [is] a person whose conduct is within the scope of the grand jury's investigation," while a "target" is a person about whom prosecutors have gathered "substantial evidence linking him/her to the commission of a crime." Since a subject is only a step removed from a target, and since Fields was the only client of Pellicano's to volunteer to reporters that he was a subject, he invited speculative press stories that he was the "big fish" prosecutors were pursuing. Soon after Pellicano went to jail, vowing never to coöperate with the government, Fields (joined by Universal's Ron Meyer)

offered to raise money for the education of Pellicano's children. "There's nothing sinister about that," Fields told me. "I would think that people who had used his services would want to take care of his kids." But most of the private detective's former clients declined to participate, and, in the end, Pellicano publicly refused to take money from anyone. A grand jury has been impanelled since February, 2005, but Fields has never been summoned to testify, which could suggest that the prosecution case is weak—or that the prosecutor and the grand jury are just accumulating evidence.

While Pellicano is serving his sentence for weapons possession, federal prosecutors are focussing on who knew about his illegal wiretapping—one of several crimes allegedly committed by Pellicano as part of what the government called a "criminal enterprise." The investigation is being led by Assistant U.S. Attorney Daniel A. Saunders, a forty-three-year-old Princeton graduate who once wanted to be an actor. Saunders has restricted information about the inquiry to a handful of associates; he refuses to give interviews, and reporters have told me that the prosecutors are not leaking stories to them. The sole exceptions I could find came earlier this year, when a story saying that Steven Seagal was not a suspect in the threats against Anita Busch was attributed to the U.S. Attorney's office, and when it was revealed that Fields's law firm would not face indictment.

"There are three universes of knowledge about the case," Henry Weinstein, a Los Angeles Times legal writer, says. "The first is law enforcement—the U.S. Attorney's office, the F.B.I., and the District Attorney's office, which is engaged with the Anita Busch case. Then, there is a parallel universe of all the people who were allegedly wronged by Pellicano." These people usually view the case through a narrow keyhole, as does "the third universe of knowledge, the defense lawyers." The gaps are filled by rumors, which occasionally reveal a fact—for instance, that two C.A.A. agents were interviewed by F.B.I. agents because they had been wiretapped. That, in turn, increased speculation that Ovitz had hired Pellicano to investigate his former firm. The level of rumor about the scandal is extraordinary, even by the standards of a city in which gossip is the currency of social discourse. Thom Mrozek, the press officer for the U.S. Attorney's office, says that earlier this year he was receiving between thirty and forty calls and seventy e-mails each day about the case from the press. The New York Times has two reporters assigned to covering it, and the Los Angeles Times has three. "I don't think I've been to a dinner or a lunch where it hasn't come up," Arianna Huffington, who writes and edits a popular blog and is a friend of Fields, says.

This is unsurprising, since Hollywood is ultimately talking about itself. It was known, for instance, that Pellicano had been retained to work for Tom Cruise to suppress possible tabloid stories during his divorce from Nicole Kidman; for the comedian Chris Rock in a paternity lawsuit against a Hungarian model; for Mike Myers in a dispute with Universal; and for Michael Jackson. Was it possible, people asked, that celebrities were also a target of the prosecutors? And although the names of such powerful non-celebrities as Fields, Ovitz, and Grey do not appear in the February indictment, Fields represented Grey in contract disputes with the comedian Garry Shandling and the producer Bo Zenga—both of whom were listed as victims of Pellicano.

Grey told the New York Times in March that he was only "casually acquainted" with Pellicano, but F.B.I. documents seemed to show, according

to the *Times*, that Grey "learned information about [Zenga and Shandling] directly from Mr. Pellicano." Grey's attorney, Ron Olson, told me that anything Pellicano may have learned was given not to Grey personally but to the Fields law firm. "At no time was Mr. Grey aware of wiretaps or any other illegal activity used by Anthony Pellicano in his investigation," Olson added.

The first major Pellicano client to be indicted was Terry Christensen, a member of the Hollywood legal establishment. Christensen had worked for the billionaire Kirk Kerkorian for thirty-five years; the charges related to work he did on Kerkorian's behalf in a battle over child support. The indictment alleged that Christensen paid Pellicano a hundred thousand dollars to bug Kerkorian's ex-wife's telephone, and it quoted from what appeared to be taped conversations between Christensen and Pellicano, during which Pellicano advised the lawyer, "Be very careful about this because there is only one way for me to know this." The next to be charged was John McTiernan, the director of such blockbusters as "Die Hard" and "The Hunt for Red October." It was alleged that McTiernan, who has since pleaded guilty, lied to F.B.I. agents when asked if he knew that Pellicano had wiretapped a producer. The clear implication was that Pellicano had taped both Christensen and McTiernan. Perhaps, some speculated, he taped all his clients. To date, fourteen people, including two police officers and two telephone-company employees, either have been indicted or have pleaded guilty.

The U.S. Attorney's office, with help from intelligence specialists, tried to decrypt tapes that Pellicano had told his lawyers could not be decrypted. In court in March, Assistant U.S. Attorney Saunders predicted "one further superseding indictment" by mid-April, which heightened speculation that his office was putting new pressure on Pellicano to talk. Pellicano's attorney, Steven Gruel, told me, "He will not provide the government with that gift. He is not a rat," and in June Pellicano told the *Los Angeles Times*, "My loyalty never dies." Even if Pellicano did coöperate, his testimony might not prove that his clients were aware of illegal ac-

tivities. "He'd be worthless as a witness, unless you had a tape," the attorney Harland Braun says. "I don't think you could convict anyone based on Pellicano's word." In mid-June, the government admitted that it had not succeeded in its attempts to decrypt all the secret tapes. And though on May 22nd Saunders said, "We do anticipate bringing additional charges," he still has not produced another major indictment.

After Fields, the Pellicano client who captured Hollywood's attention most intensely was Michael Ovitz. In 1998, a couple of years after his miserable time at Disney, Ovitz launched Artists Management Group, a company that many at C.A.A., his original agency, believed was like a father competing against his children. C.A.A. agents joined his many enemies. The press chronicled the ways in which his new company was failing. According to

the New York *Times*, Ovitz told the F.B.I. that he paid Pellicano seventy-five thousand dollars to investigate two C.A.A. agents and, among others, his former partner Ron Olson, David Geffen, and the reporters Anita Busch and Bernard Weinraub, then with the New York *Times*, who were allegedly harming his ability to sell Artists Management Group. When Ovitz appeared before the grand jury in the summer of 2005, he denied knowing about Pellicano's illegal activities.

Ovitz works in a one-story concrete building—a former film-production studio—that sits like a bunker on a quiet Santa Monica street. Exposed pipes traverse the high ceiling; a collection of contemporary German art fills the walls. When he worked in Beverly Hills, at the I. M. Pei-designed C.A.A. headquarters that he commissioned, he wore charcoal suits, white shirts, and Hermès ties. One day in May, he greeted me wearing a black Nike T-shirt, jeans, and gray



*"I sometimes wonder if I should have invested so much in the one cow."*

sneakers without socks; his chestnut hair nearly touched his shoulders.

Ovitz, who refuses to discuss his current activities in any detail, has about fifteen employees, who manage his art, his business ventures in real estate and finance, and a Japanese restaurant he owns, Hamasaku, in West L.A. He plans to open another restaurant later this year. One of his attorneys, James Ellis, joined us in Ovitz's office.

"I don't think anybody knew what this guy was doing, because this guy traded in information," Ovitz said of Pellicano, picking up a basketball and pacing slowly. "That's what he did. I used to watch Perry Mason reruns all the time. There was this guy who's a private detective, Paul, and he always came in at the last minute and slipped a note to Perry Mason in court at the most critical time. So now I say to myself, 'Let's see here, did Perry Mason ask Paul how he got that information?' Don't think so. 'Did Paul get it all legally?' Don't know. 'Was it just a blank slip of paper?' Probably. That's more than I ever got. But, whichever it was, it sure seemed to save the day for poor Perry."

Ovitz said that he couldn't speak for others, but that Pellicano "didn't produce anything for us to even ask about. The lawyers hired him. We got nothing, zippo." Ellis added, "We asked for a refund." Ellis and Ovitz declined to say what they wanted to learn from Pellicano, or whether Ovitz had hired Pellicano to pursue Anita Busch. As for the stories about Pellicano's ties to Illinois mobsters, Ovitz said that he never saw them. "To me—this is going to sound really stupid—but the couple of times I met him he seemed really out of shape. He was just a regular-looking middle-aged man. He didn't look like those imposing guys on 'The Sopranos' or in 'The Godfather.'"

Press accounts have suggested that Ovitz is being investigated in the wiretap scandal. Ovitz says that the stories about him "are basically not accurate." The one "article that surprised me was the Ron Meyer article," he said, a reference to a New York *Times* story saying that Meyer had visited Pellicano in prison and "urged Mr. Pellicano to 'drop a dime on' Mr. Ovitz." Nothing, he believes, could have justified his former partner in urging Pellicano to claim that he had done something criminal.

Ovitz insisted that he had no idea what his legal situation was; Ellis said that Ovitz was "a potential witness," but suggested that he was neither a subject, like Fields, nor a target.

Ovitz and his lawyers are aware that he still has enemies in Hollywood. "I think that what I've learned at this stage of my life is that if I could do it again I'd absolutely do it differently," Ovitz says. "But being in the agency business and starting a business at age twenty-six and building everything from scratch, I was as tough as I felt I needed to be, and probably tougher than I should have been." Hatred of Ovitz seems undiminished by time. One major Hollywood figure says, "If Ovitz gets indicted, there will be parties. It will be the end of a Shakespearean tale."

In May, at a club in midtown Manhattan, Bert Fields hosted a book party for Kathy Freston, whose husband, Tom, is the C.E.O. of Viacom. At the party—Barbara Guggenheim and Rupert and Wendi Murdoch were among the co-hosts—one guest murmured about Fields, "I'm amazed he came." But if Fields is suffering from having been a subject of federal interest since 2003, he's not letting on—at least, not publicly. Gustavo Cisneros, a friend of Fields who is the chairman of a privately owned media conglomerate, recalls phoning him this spring to inquire how he was. "Gustavo, don't be concerned," Fields responded. It was the last they spoke of the case. Susan Estrich (Guggenheim and Fields are the guardians for her two children) says it's "a disgrace the way his name has been dragged through the mud." Estrich, a Democratic activist and occasional television pundit, has gone so far as to wonder whether pressure from conservative Republicans is animating the drive to get Fields and also Hollywood.

Fields is more circumspect. When asked if it frustrates him to be silenced, he says, without hesitation, "Oh, yeah. If it were a case that I was trying, I'd be all over the press, all over everything. That's my style. But I have very good counsel in this case, and I'm going to follow him." As for the specifics of the case, Fields won't go beyond his public comment, which is that he had "no



*"And this one is the very first surgical procedure I ever performed."*

knowledge" of wiretapping and would never condone it.

There is a five-year statute of limitations for wiretapping crimes, and for some of the cases in which Fields may be implicated the limit was due to expire in March. At the request of the U.S. Attorney, he has three times consented to extend the deadline. For a prosecutor, it means more time to gather evidence; for a potential target who wants to avoid the ruinous spectre of an indictment, it shows a willingness to coöperate. In early May, Fields believed that the case would either collapse or lead to formal charges by the end of that month. In mid-July, though, he said that he still wasn't sure of his status; his lawyer, John Keker, who had been talking regularly with prosecutors, had not heard from the government since May 3rd.

"The first time the F.B.I. came to my office was three years ago," Fields told me. "I talked to the agents voluntarily. I had nothing to hide. For the succeeding three years, I've been a subject of their inquiry. It's very hard on my wife. When the United States government says to you, 'We think we may have evidence to put your husband in jail for a long, long time,' to a woman who loves her husband that's a frightening, horrible concept. How would she not be tortured by that?"

We were in Fields's house in Malibu, sitting in the dining alcove, which also serves as the entrance foyer, and one could see Fields's reflection in a mirror that covers one wall. "I don't pretend it's easy," he said, "but when you saw this lovely woman you've been married to for twenty-seven years"—his voice broke—"slowly die of cancer, nothing after that is hard. This is easy compared to that." His eyes filled with tears.

When I asked Fields if he had learned anything from this ordeal, his reply seemed somewhat labored. "I have to go back in time to answer that question," he said. "When I was in the service, I prosecuted high-profile military cases. I had the attitude of a prosecutor: I wanted to get these people and convict them because I was convinced that they had betrayed their trust as officers or airmen. I felt imbued with a spirit of defending the country. So I understand what the mentality



"I just had him bolted to the floor."

must be of a young prosecutor, having been one myself. But having now seen what it's like to be on the other end of that huge force that is the United States government when one is not guilty, it brings a kind of sense of completion to my understanding of the criminal process. By that I mean I saw what it was like to want to convict as a prosecutor, and I see what it is like to myself and my family and my partners to be accused of something I didn't do, and to have to fight the power of the United States government."

Fields insists that he has no idea where the contents of Pellicano's safe will lead, but his firm hired the private detective in six of the cases referred to in the indictment—more than any other firm. Fields's firm also encouraged a prominent art collector and hedge-fund manager, Adam D. Sender, to hire Pellicano, and the New York *Times* reported on June 26th that Sender listened to illegal wiretaps and is now coöperating with the U.S. Attorney. Fields knows that there will be civil lawsuits against law firms, including his, and that these lawsuits might reopen several cases. There will be a trial, now scheduled for late October, for Pellicano and his co-defendants.

If Fields is charged with a crime, his record suggests that he will fight. To this

day, he thinks that Howard Weitzman and Johnnie Cochran made a grave error by reaching an out-of-court settlement in the Michael Jackson case. "I felt he would damage his career irrevocably by paying a huge amount in a settlement," Fields says. "When you try a criminal case," he adds, "you have working for you 'a reasonable doubt,' which is an enormous weapon."

Even if Fields is not indicted, people who have followed the case and his career will undoubtedly continue to ask what he knew about Pellicano's services and what he should have known, and how, as one prominent Hollywood lawyer said to me, "smart people could be so stupid." One Fields client, insisting on anonymity, suggested that Fields's competitiveness is at the root of his legal problems. Referring to the missing Elaine May film, he said, "I can imagine that a guy who steals the negative of a Paramount film and who is a lawyer and an officer of the court can do anything."

Finally, I asked Fields if he was angry at Pellicano. "Sure, I'm pissed off at him," he said, and then his tone shifted: "I know the pressures he had. He would call me and say, 'Can't you get me any work?' His expenses were enormous. It's inexcusable. But I can't be too hard on Anthony Pellicano. This is a guy who did good work for us." ◆