# EXHIBIT   2

1-22-99

Memo to file

AFTI - preliminary analysis,
tapes have been tampered with
More so w/ respect to the 10-17 tape

1-29-99

tele conf of Cain

9 printouts - 5 on tape 10-19-94
9   "    "    10-17-94

10-19-94    definite edits - need to
tgt recorder - words
may have edited out -
overrecording process

10-17-94    possible overrecording

"different recorders"

3-30-01    tele conversation of Mr. Cain

# EXHIBIT   3

II.    **WHETHER THE CONVICTIONS SHOULD BE VACATED FOR THE CONCEALMENT OF EXCULPATORY EVIDENCE, ORDERED TO BE PRODUCED BY THE COURT?**

In Grand Jury proceedings, the government played certain audiotapes of conversations in furtherance of obtaining a True Bill of Indictment against Appellants. (See indicment Count I, paragraphs 8-12, Count 3, paragraphs 19-22 24(c), Counts 62-66).

In December 1998, Appellants advised trial counsel that the entire audiotaped conversations made, by the government, of Appellants were extensively manufactured and falsified. Defense Counsel retained the services of a forensic audio expert, Steven Cain, to examine the audiotapes and his findings were subsequently reported to Defense Counsel. (R.356 EX 7). In these findings, it was reported that the audiotapes of Appellants were falsified and the tapes contained definite edits, over-recordings and were made with multiple tape recorders. Id.

On September 30, 1999, a Motion to Compel the Prosecution to Retain and Produce the Original Tapes and Recording Devices Used to Record the Conversations of the Defendants and Others in this Cause, was filed specifically stating that the <u>original tapes and recording devices **must** be examined</u>. (R.108)(Emphasis added).

On August 30, 2001 Mr. Cain arrived in Chicago to test the audiotapes and recorders and was denied access to the tapes. (R.356 EX 8).

On September 6, 2001 a Motion to Require the Government to Allow the Defense Access to Certain Cassette Tapes and Recording Equipment for Expert Witness Examination, was filed specifically

21

stating that the <u>original tapes and recording devices</u> **must** be
<u>examined</u>. (R.108)(Emphasis added).

On August 30, 2001, Mr. Cain arrived in Chicago to test the
audiotapes and recorders and was denied access to the tapes. (R.356,
EX.8).

On September 6, 2001 a Motion to Require the Government to
Allow the Defense Access to Certain Cassette Tapes and Recording
Equipment for Expert Witness Examination, was filed specifically
requesting the Defense be allowed to examine and test the <u>original</u>
<u>tapes and **recording equipment**</u> used to record their conversations.
(R.146)(Emphasis added).

On January 2, 2002 a Motion to Allow Defendants to Examine
and Test Certain Audio Tapes at their Expert's Laboratory was filed.
(R.167). An Order issued by the Court on January 2, 2002 granted
this Motion. (R.168).

On January 9, 2002 the tapes were brought to the expert's
laboratory with no recorders. The NAGRA audiotape of a September
21, 1994 conversation was brought without the original recorder
and could not be tested, because the NAGRA tape recorder is a,
"proprietary federal law enforcement recorder, [and] the recorder
itself together with the playback Expander box are normally not
available for private forensic testing. (R.356 EX.11). Futhermore,
Mr. Cain stated, "S/A Dewick (sic) also advised that he was not
aware of the specific recorder used to manufacture Exhibits Q-1
and Q-2." Id.

On January 17, 2002, 11 days before trial, Attorney Tommy
Brewer was retained solely for matters surrounding authentication,
analysis and testimony surrounding audiotape evidence. His fee
was fifteen thousand dollars ($15,000). (R.237).

On February 25, 2002 another Order was issued <u>Ordering and
Decreeing</u> that the government shall make available to Yonovitz
& Joe, L.L.P. for inspection and testing purposes the original
tapes and <u>recording devices used to record [Appellants'] conversa-
tions</u>. In addition, it was further <u>Ordered</u> that the government allow
Yonovitz and Joe access to the logs and maintenance records generated
in connection with the recording of the referenced conversations.
(R.193)(Emphasis added).

On February 27, 2002 Forensic Audio Expert Herbert Joe arrived
in Chicago from Oklahoma City, Oklahoma pursuant to the Order of
February 25, 2002. No recording devices, logs and maintenance records
generated in connection with the recording of the [Appellants']
conversations were provided, in violation of the Court's Order.
(R.356 EX.12). Furthermore, "S/A (DeWick?)(sic) who provided the
5 recordings explained that there were <u>no records of which recorder
made which of the 5 recordings. Id. (emphasis added). Mr. Joe found
that inconsistencies and discontinuities existed, referencing the
earlier expert's findings, and was unable to make a definitive
determination of the authenticity of the tape recordings and stated
that the NAGRA recording was not subject to <u>any</u> examination. (R.356,
EX.14)(Emphasis added).

On March 7, 2002 the following exchange was made before the

Court:

| | |
|---|---|
| Mr. Brewer: | Judge, before you go, just one matter? |
| The Court: | Sure. |
| Mr. Brewer: | Judge, there's another court issue, the order for the production of the original tape recorders as well as the tapes and logs. (T:2010 22-25, 2011:1).<br><br>The tapes, the tape recorders were not turned over. I understand that they were not available as the bureau was not using those tapes anymore. In addition, that Agent Diwik was not I guess the agent, the case agent at the outset of the case, and those were not produced I guess for that reason. I just wanted to bring that to the Court's attention. (T:2011 2-8). |
| Mr. Netols: | I am not sure where Mr. Brewer is going. We addressed this at length in a status in chambers. I think what he's saying, and I don't want to misunderstand, but there was a request before, and this was back when they had the first expert, Mr. Cain-- |
| The Court: | Right. |
| Mr. Netols: | --who rightly found there was nothing wrong with our tapes.<br><br>That he wanted the original Nagra cassette recorder, and I explained that all of the agencies are very careful with logging and keeping track of all the original tapes; that Nagra is like any other Nagra. **They don't keep track of one or the other.**<br><br>So to go back five years or more and try and figure out which Nagra a given agent was using, **a recording device to record calls or record a meeting, simply wasn't possible based on the records that the bureau had.** In all likely, given the passage of time, those items might also have been retired from service. (T:2011 9-25, 2012 1-2)(Emphasis added). |
| The Witness: | Your Honor, when I met with their tape expert the other day in our offices, I had a difficult time finding a Nagra play-back unit, which is basically just a Nagra recorder that you play through a speaker. I had to go to great lenghts to obtain that device. It's no longer used by the bureau. **We don't even have them.** If I could find him the one that was used, I would certainly give it to him, but they are not in existence any longer. |

```
Mr. Netols:     Judge, do you know what a Nagra is?
The Court:      I have a dim recollection of it.
Mr. Netols:     It's an old fashioned--
The Court       I haven't heard of one for a long time.
Mr. Netols:     It's the old fashioned reel-to-reel--
The Court:      Right
Mr. Netols:     - which they don't use anymore.
Mr. Brewer:     Okay.
The Court:      Okay. (T:2012 9-19)(Emphasis added).
```

On March 18, 2002 an Order was issued for a third audio expert to examine and compare the work product of the previous experts. (R. 206). Total cost of experts, twenty seven thousand dollars ($27,000)(R.352). Total cost to retain separate counsel, fifteen thousand dollars ($15,000)(R.237).

On June 27, 2004 and July 30, 2004, Appellant Janice was allowed access to evidence at the United States Attorney's Office in Chicago. (R.352). Janice photocopied documents relating to the audiotapes, including an FBI FD 597 Receipt for Property Received/Returned/Released/ Seized, dated 8/3/94 for one tape recorder, serial# U.S. 564564 and Released to the Custody of and Received by John Marzette, Chicago Housing Authority, Department of Public Safety. The recorder was received from FBI Agent Connie Redden and original FBI Case Agent John Robert Shoup. (R.356 EX.13).

The statements made by Assistant United States Attorney Netols and FBI Special Agent John Diwik were false and the evidence obtained from the United States Attorney's Office confirmed that records are, in fact, kept that reflect just the opposite of the statements given by both these men. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. Banks v. Dretke, 540 U.S. 668 at 696, 157 L.Ed.2d 1166, 124 S.Ct. 1256 (2004).

Non-disclosure of exculpatory evidence is not just restricted to the prosecutor, but also applies equally to [agents] and investigators. The Supreme Court found that the Brady duty of turning over exculpatory evidence includes not only the prosecutor, but the investigating officers as well. Kyles v. Whitley, 514 U.S. 419, 438 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). It is well settled that information possessed by any member of the United States Attorney's Office will be attributed for these purposes, to the "prosecution." U.S. v. Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (1972). It is well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process rights. See, e.g., United States ex rel. Smith v. Fairman, 769 F.2d 386, 391 (7th Cir.1985). In Moore v. Illinois, 408 U.S. 786, 33 L.Ed.2d 706 at 722, 92 S.Ct. 2562 (1972) the Court profoundly stated:

> [When] the prosecutor [knows] that evidence exist[s[ that might help the defense, that the defense had asked to see it, and that it was never disclosed.... when the prosecutor consciously uses [agents] as part of the prosecutorial team, those [agents] may not conceal evidence that the prosecutor himself would have a duty to disclose. It would be unconscionable to permit a prosecutor to adduce evidence demonstrating guilt without also requiring that he bear the responsibility of producing all known and relevant evidence tending to show innocence. (Emphasis added).

There is no question that Mr. Netols was aware that the evidence needed to comply with the Orders of the Court was in his possession, because it was found among his personal notes. It was intentionally concealed and withheld and the Court was told that recorders were not kept because the case was too old.

26

Appellants have maintained, from the first day of listening to these audio recordings in 1998, in their motions from 1999 forward and in their Rule 33 Motion, that the audiotapes made by the government are falsified representations of conversations that never took place; not portions or segments of the audiotapes, but entire conversations! A conviction, of any kind, could not occur based upon manufactured evidence created by the government. Manning v. Miller, 355 F.3d 1028 (7th Cir.2004). Prosecutors are not immune when withholding exculpatory evidence. Newsome v. McCabe, 256 F.3d 747 (7th Cir.2001).

The need to review the tapes against the recorders was critical and the Defense requested them in their motions from 1999. In Brady v. Maryland, 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963), the case is characterized by a pretrial request for specific evidence. The test of materiality in a case like Brady in which specific informa- tion has been requested by the defense is not necessarily the same as in a case in which no such request has been made. Id at 350. Since its holding in Brady, the Court has expanded the scope of the govern- ment's duty to disclose. Recognizing that "elemental fairness requires [such evidence] be disclosed even without a specific request [by the accused]." United States v. Agurs, 427 U.S. 97, 100, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); United States v. Bagley, 473 U.S. 667, 680-81, 105 S.Ct. 3375, 3382-83, 87 L.Ed.2d 481 (1985). In order to prevail under Brady and its progeny, a defendant must demonstrate: (1) that the prosecution suppressed evidence within its possession; (2) that such evidence was favorable to the defense;

(3) that the suppressed evidence was material. <u>United States v.</u>
<u>White</u>, 970 F.2d 328, 337 (7th Cir. 1992); <u>United States v. Hartman</u>,
958 F.2d 774, 790 (7th Cir.1992).

In this case, numerous motions, followed by Orders of the Court,
Ordered the government to turn over the tape recorders and supplemental
requested documentation, and the government, despite those Orders,
concealed and deliberately did not. In Brady, the request was specific.
It gave the prosecutor notice of exactly what the defense desired.
When the prosecutor receives a specific and relevant request, the
failure to make any response is seldom, if ever, excusable. <u>Brady</u>
at 351. The deliberate withholding, by the government, of the tape
recorders in this instance deprived the Appellants from proving
that the audiotapes of their conversations were created. These recorders
were critical and provided an "electronic fingerprint" specific
to the tape made from that machine. It would show definitively that
the audiotapes could not have been genuine and were fabricated by
other means in order to re-create a totally different conversation
from the one that took place. In today's technological world, the
use of digitalizaton has made it possible to re-create images and
voices not possible before. One merely can see this on a visit to
a movie theater or in ones own home with the sights and sounds produced
by computer in digitilized format. The benefits for moviegoers is
remarkably entertaining. The technology in the wrong hands, with
sinister applications, in the case before this Court, is devastating.

The Defense had carried its burden of specifically requesting
the documentation and actual tape recorders used to make the audio-

tapes on several separate occasions, followed, when the government failed to volutarily provide the items, with the issuance of Court Orders. The evidence requested was both material and would have affected the outcome of the Grand Jury[4] in their specific questions directed to Mr. Netols and would have resulted in acquittal of the Appellants upon discovery of the falsities. There is no other explanation that can be given for concealment of this evidence. To now state, during trial, that the tape recorders have vanished or disappeared because of the age of the case is incomprehensible and flies in the face of what logic dictates. The absurdity of the remarks before the Court also gives the underlying impression that it somehow was the fault of the Defense for not requesting the recorders sooner. Nothing is further from the truth as the record reflects. To deny knowing what tape recorders made what tapes, both to the court and to the forensic experts, is false, because if you didn't know which tape recorders were used to make the recordings, then how would you know that the FBI doesn't have them? If this were a true statement, every case handled by the FBI would be in peril due to the passage of time. The Federal Bureau of Investigation Manual of Investigative and Operational Guidelines (MIOG) and Manual of Operational Procedures (MIOP) provide for strict procedures to safeguard both audiotapes and records of recorders in their Electronic Surveillance Filing System (ELSUR) which was also uncovered in the United States Attorney's Office. (R.356 EX.15).

Just the serial numbers of the recorders as discovered on the FBI FD 547 form found after trial, would have matched a recorder

---

4.    During Grand Jury testimony of FBI Agent Timothy Hepperman, a Grand Juror asked a question surrounding Richard Kozak and Appellant, to which Mr. Netols replied, "that's why were playing [the tapes] them."

to a tape found on the logs, also discovered after trial. (R.356
EX.13). This information alone, would have given the Defense an
opportunity to conduct tests similar to those done in forensic
firearms examinations, or ballistics. If a bullet is fired from
a weapon and a second bullet exists, fired from the same weapon,
then a comparison can be made with a determination that the weapon
fired both bullets. Likewise, if an audiotape is made with a known
recorder, then a comparison can be made with another audiotape made
by the same recorder to determine that the recorder made both tapes.
Here, **any** audiotape from **any** other **unrelated** case is sufficient
for that determination. There is, undoubtedly, a wide array of
audiotapes still available and preserved with the FBI Electronic
Surveillance Filing System (ELSUR) for comparison that would have
been made from that recording device. Only one problem exists that
the government will not disclose, which is the identity of the tape
recorders and the physical recorders themselves. Since Mr. Netols
previously represented to the Court that the agencies are very careful
with logging and keeping track of all the original tapes, the deliberate
withholding of this and other Ordered evidence is easy to understand,
especially if it is evidence that would affect the outcome of the
trial.

During trial, all three audiotapes were played for the jury,
despite definitive authentication, with the September 21, 1994 tape
undergoing no examination whatsoever. In addition to inconsistencies
reported by previous forensic experts, with the start and stop times
of recordings, other inconsistencies were developed during the
testimony of witness Richard Kozak. (R.356 EX.14). In the very

beginning of the September 21, 1994 tape, Appellant is heard entering

a room, unescorted and unannounced and stating that, "we've met

already" referring to Kozak. (T:1224 9-16). In further testimony,

Kozak states that he saw Appellant at one of the housing developments

when President Clinton was coming, but never met him. T:3395 12-23,

1224 14-16)(Emphasis added). Questioned on how Appellant was brought

into the room for the meeting, Kozak testified:

> Q.    Do you know if, for the meeting on September 21st,
>       1994, was Mr. Skrzypek brought into the room by
>       anybody? Did you see them enter the room where
>       the meeting took place?
> A.    Oh, was he brought in"
> Q.    Yes.
> A.    No. I mean, he came voluntarily, and he walked
>       into the office with the rest of them.
> Q.    You said he walked in. Did you all walk into
>       the room together? is that what you're saying?
> A.    I don't know if all the other three -- I mean,
>       Maerz would have been in the office. I don't recall
>       whether or not the three of us all walked in at
>       the same time or whether or not. I went out to
>       greet him or we weren't in the office and he just
>       came into the office, I don't recall that detail
>       counsel.
> Q.    Could you have escorted him into the meeting?
> A.    Sure.
> Q.    Do you recall if you did?
> A.    I do not know. (T:3396 7-25).

Kozak's earlier testimony indicates that he both listened to the

tape and reviewed the transcript. (T:1223 2-21).

Kozak testifies next about the configuration of the building

that the meeting is taking place:

> Q.    Are there more than one office in the building
>       where the meeting took place?
> A.    Yes.
> Q.    And how was Maerz' office identified?
> A.    Outside of it being the biggest one, it would be,
>       it would be -- there was staff that was situated
>       right outside his office as opposed to any of the
>       other offices. (T:3397 1-7)(Emphasis added).

Questioned about how long the wire was turned on, Kozak testified:

Q.    How would you know or what determined at what time
      point you would turn the wire on?
A.    The wire, when it was put on me, it was on.
Q.    And how long before this meeting was the wire turned
      on?
A.    I don't know. <u>Fifteen minutes, half hour.</u> I do
      not know.
Q.    So you did not wait until Mr. Skrzypek was in the
      room. Once the agents put it on you, it was on,
      and your testimony is about 15, 20 minutes before
      the meeting?
A.    And that's an approximation. I do not know.
      (T:3397 8-19)(Emphasis added).

The impossibility of the events portrayed by Kozak are astonishing.
Testimony is given that a body recorder is placed on Kozak 15 to
30 minutes <u>before</u> a meeting, but immediately after that tape goes
on, Kozak is heard walking to the meeting. Appellant walks in off
the street, enters a building containing several offices and goes
directly to the one where the meeting is being held which happens
to be the Office of the Director of Public Safety for the Chicago
Housing Authority, which has several staff and secretaries posted
right outside his door, unescorted, unannounced, immediately behind
a person Appellant **NEVER SAW BEFORE IN HIS LIFE,** at precisely the
same time the meeting is to take place and the very first words out
of his mouth are, "we've met already!" The Appellant then hands him
his business card. Does this make sense? The answer is no, because
it never happened!

When evidence was deliberately withheld from the Defense, it
also neutralized Defense Counsel's ability to impeach government
witnesses, violating Appellants Due Process Rights and is a Brady
Constitutional violation. See also <u>Giglio v. United States</u> Id.
The Supreme Court stated the right to cross-examine includes the

opportunity to show that a witness is biased, or that the testimony is exaggerated or unblievable. <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 51-52, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). This was evident where Kozak testified to his knowledge of signing receipts for tape recorders. Kozak testified:

> Q.    Did you have to sign a receipt for the wire that you were wearing?
> A.    I don't know. You see, I don't recall whether or not I signed something indicating that. I was obviously aware that I was doing this. I don't recall whether or not I had to sign a document, but not a receipt, no.
> Q.    And do you know what type of recorder was being used that you were using at that time?
> A.    No, sir. (T: 3394 12-20)(Emphasis added).

Those answers were perjurious and would have been impeached if the Defense was in possession of the documents Ordered by the Court, since Kozak, alone, was involved with 46 out of 63 recordings listed on the logs previously Ordered turned over to the Defense. (R.193). He would have been further impeached with the same receipt recovered, after trial, among Assistant United States Attorney Brian Netols' personal notes corresponding to the logs. (R.356 EX.13). A safe bet would be that Kozak's signature also appears 46 times on receipts for tape recorders showing <u>serial numbers of the recorders</u>!

A total of $42,000 for forensic experts, and an attorney, retained 11 days before trial, specifically for the audiotapes in this matter, was expended by the Defense to authenticate 3 audiotapes. The government took affirmative steps to prevent the Defense from leaning of exculpatory material and frustrating attempts to obtain this material despite numerous motions and Court Orders for its production. The Defense did its job and the law is very clear. The

33

Court reviews this issue for plain error when it is obvious, affects substantial rights and seriously affects the fairness, integrity or public reputation of the judicial proceedings. It was not lack of diligence by the Defense as the reason Appellants did not have the Brady and Giglio material that the government suppressed. There is no reason, whatsoever, to go through such massive expense to get to the truth, only to have the path to the truth repeatedly blocked by the government. A prosecutor who conceals or suppresses exculpatory evidence does so because he knows, if revealed, it would affect the outcome of the case. There would have been no probable cause for an indictment without the audiotapes, as clearly evidenced from the questions asked of Mr. Netols by one of the Grand Jurors. The government could never have been able to show any relationship, whatsoever, with their operative, and needed the audiotapes to show a connection, but in their plans, they erred; they created a scenario that was patently ridiculous and absurd, and only through the withholding, concealment and suppression of pertinent evidence did this plan succeed at all. It defies belief that one would find the necessity to create or falsify evidence in order to achieve a criminal conviction, but that is precisely what occurred in this case. To "clone" a voice to obtain words which have not been spoken is a frightful prospect which this Court must condemn.

Therefore, the convictions must be reversed.

# EXHIBIT   4

No. 05-2055
05-2056

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Appeal from the United States |
| | ) | District Court for the Northern |
| Plaintiff-Appellee, | ) | District of Illinois, |
| | ) | Eastern Division |
| vs. | ) | |
| | ) | Case No. 97 CR 516 |
| | ) | |
| JAMES R. SKRZYPEK, | ) | Hon. James B. Moran, |
| | ) | United States District Judge, |
| Defendant-Appellant. | ) | Presiding |
| | ) | |

## MOTION TO RECALL THE MANDATE

NOW COMES, Defendant-Appellants James and Janice Skrzypek, Pro se, and submits this Motion to Recall the Mandate. In Support of this Motion, Defendant-Appellants state as follows:

1.    On February 20, 2007, the district court granted the government's Motion to Supplement the Record on Appeal and on February 27, 2007, the Clerk of the District Court sent the record to this Court.

2.    On March 16, 2007, Defendant-Appellants filed a Motion to Supplement the Record on Appeal with the district court to include their Responses in Opposition. On March 20, 2007, the motion was granted and on March 21, 2007, the Clerk of the District Court sent the record to this Court.

3.    At exactly the same time Defendant-Appellants motion was granted and the record was sent, this Court reached a decision in the Appeal of Defendant-Appellants.

1

4.    On March 29, 2007, Defendant-Appellants made a timely
Petition for Rehearing, which was returned, bearing the stamp
"RECEIVED AND RETURNED UNFILED" by the Clerk of the Seventh Circuit
Court of Appeals, with instructions to have appointed counsel file
the Petition. (Ex.1).

5.    On April 10, 2007, the district court granted appointed
counsel's motion to withdraw.

6.    On April 16, 2007, Defendant-Appellants filed a Motion
for Leave to File the Petition for Rehearing, which was returned,
bearing the stamp "RECEIVED AND RETURNED UNFILED" by the Clerk of
the Seventh Circuit Court of Appeals, with instructions that the
only filing acceptable would be this instant motion. (Ex.2).

**ARGUMENT**

Defendant-Appellants have acted diligently with their Petition
for Rehearing. A decision of an appellate court whether to recall
a mandate may be affected by the timeliness of the request. 28
U.S.C.A § 452. A mandate once issued will not be recalled except
by order of the court for good cause shown. Hines v. Royal Indeminity
Co., 253 F.2d 111, 114 (6th Cir.1958): The "good cause" requisite
for recall of mandate is the showing of need to avoid injustice.
This court can, however, recall its mandate to prevent injustice.
Gradsky v. United States, 376 F.2d 993, 995 (5th Cir.1967).

The Court has overlooked Defendant-Appellants Responses in
Opposition, that were not considered, in making their decision in
this case. Defendant-Appellants submitted transcripts that show
twenty four (24) separate alterations from those filed by the govern-

2

ment. The alterations show additions, including the addition of
new speakers, missing pages, repetitions of conversations, changes,
in which the preamble and ending of one of the tapes is totally
deleted because the start and stop times of the tape are reversed.
Also the tapes and transcripts contain speaker gender substitutions,
in which an identical statement made on both transcripts changed
from a female to male speaker. This is impossible and confirms the
existence, among other things, of more than one set of audiotapes.

In the case of the time reversals, 2 FBI Special Agents are
taping a conversation and both the start and stop times are reversed.
The speaker is the same Agent who prepares Summary Sheets of all
secretly recorded conversations and starts the recorder at 9:48
a.m. and turns it off at 9:45 a.m. The Summary Sheet of the Special
Agent shows the starting time of the tape at 9:43 a.m., but the
Agent states on tape, in his own words, that the tape is starting
at 9:48 a.m., lasting for 3 minutes, making the ending time 9:51
a.m., not 9:45 a.m. as reflected on the government's transcript.
The government now eliminates both the preamble and ending of the
tape in their transcript and places the starting time at 9:45 a.m.,
so there is no trace of the reversals. [In short], a transcript
is evidence of what was said in the original conversation. U.S.
v. Sutherland, 656 F.2d 1181 at 1200, fn.15 (5th Cir.1981).

The purpose of having a complete record on appeal is to accur-
ately reflect proceedings in the trial court. United States v.
Ellialde-Adame, 262 F.3d 637 (7th Cir.2001). The government moved
to supplement the record on appeal and Defendant-Appellants

3

responded in a timely manner with a series of their own filings, culminating with a Motion to Supplement the Record with Responses in Opposition, along with Exhibits, that this Court voerlooked.

Defendant-Appellants 6th Amendment issues, including reasonableness, under Booker were not addressed. It may be possible that Defendant-Appellant, in the Supplemental Brief, did not frame the reasonableness issue, however, it is clear from the record, that the district court failed to analyze 18 USC 3553(a) factors.

The Court failed to address any issues relating to prosecutorial misconduct that Defendant-Appellants argued. The record, overlooked in Defendant-Appellants appeal was not complete because of the government's own activities in attempting to supplement the record with transcripts and audiotapes that were not played at trial. Defendant-Appellants advanced this with the district court and illustrated, in great detail, what the government had done. The issues raised herein are significant to the administration of justice and for a need to avoid injustice.

WHEREFORE, Defendant-Appellants respectfully request that the Motion for Recall of the Mandate be granted and for a Rehearing in their Appeal.

_____
Janice M. Skrzypek

_____
James R. Skrzypek

Janice M. Skrzypek 08374-424
P.O. Box 5000
Pekin, Illinois 61555-5000

James R. Skrzypek 08324-424
Federal Prison Camp
P.O. Box 1000
Duluth, MN 55814

4

# EXHIBIT   5

DATE:                9/21/94
                     ON:    2:45 P.M.
ACTIVITY:            CONSENSUAL MONITORING

SPEAKERS:
     KOZAK:          Richard Kozak
     DAVIS:          Barbara Davis
     MAERZ:          Christian Maerz
     SKRZYPEK:       James Skrzypek


                    *    *    *    *


1     CHRIS MAERZ          This is Mr. Kozak.

2     JAMES SKRZYPEK       We've met already.

3     KOZAK                I just, I just...

4     MAERZ                Oh, you already met?  Oh, okay.  Uhm,
5                          I'll try not to take up too much of your
6                          time (UI).

7     SKRZYPEK             One of my cards.

8     MAERZ                Thank you.  Uhm, but there's, ah, a few
9                          things that we oughta talk about and I
10                         wanna make it clear that I'm not picking
11                         you out.

12    SKRZYPEK             Okay.

13    MAERZ                'Cause GEJ was here yesterday.

14    SKRZYPEK             Oh, good.

15    MAERZ                And T force gonna be here tomorrow.

16    SKRZYPEK             Okay.

17    MAERZ                And we're discussing pretty much the
18                         same issues.

19    SKRZYPEK             Okay.

20    MAERZ                Uhm, there's a new, as you, as I'm sure
21                         you know, there's a new chief operating
22                         officer here.  Uhm, Mr. Grady, who has
23                         given, ah, given us certain kinds of
24                         instructions.  Uhm, which I thought

                              1

GOVERNMENT
EXHIBIT

A

```
 1                        that, ah, ah, at least for those three
 2                        companies right now I wanna discuss
 3                        because they have the most, ah, fall
 4                        into these categories.  First thing is,
 5                        is, uhm, ah, (Pause) what I'm gonna try
 6                        and do as much as I can when we find the
 7                        guards have, have abandoned a post.  I
 8                        will try to replace them with CHA
 9                        security force.  Until we can get ah,
10                        get replacement contract people in
11                        there.  Alright?  His position is, is
12                        that, is that for the period of time
13                        that we have to provide our people,
14                        you're gonna pay for it.  Okay?  The
15                        second thing is, uhm, ah, and this, and
16                        we've done this with GEJ, so, ah, is
17                        that if we, if the guards abandoned
18                        their post and we have to provide
19                        coverage like that, the ones who abandon
20                        the posts are fired.  We don't want 'em
21                        back on the properties.  Ah, and
22                        actually this is, this is really sort of
23                        an interim measure.  You know, I, I, at
24                        first I had thought that I wasn't gonna,
25                        ah, wasn't gonna do it at all because we
26                        had a new contract, I mean, and there
27                        are, there are some sanctions built into
28                        that contract.  Penalties.  Ah, I, I'm
29                        not at liberty to discuss all of it
30                        because it may change and it's laying up
31                        in the lawyer's offices and it's been
32                        laying there and I don't know how long
33                        it's gonna be there, so I have to, I
34                        have to apply this.  So, there's gonna
35                        be, ah, there's going to be some, ah,
36                        some penalties on the, when the posts
37                        aren't covered.  Ah, our position is, is
38                        that, ah, we are sensitive to a lot of
39                        your problems.  We, but still we're in a
40                        position where we, where we have a
41                        responsibility to the, ah, to the
42                        residents and, ah, companies that
43                        contract to cover the posts.  (Coughs).
44                        And that's what and we want the posts
45                        covered, and if you can't and we can,
46                        and you contracted for that, if we have
47                        to cover 'em, you're gonna be charged
48                        for it.

49     SKRZYPEK           I understand.
```

2

| | |
|---|---|
| 1 | MAERZ |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | |
| 36 | |
| 37 | |
| 38 | |
| 39 | |
| 40 | |
| 41 | |
| 42 | |
| 43 | |
| 44 | |
| 45 | |
| 46 | |
| 47 | |
| 48 | |
| 49 | |
| 50 | |
| 51 | |
| 52 | |

MAERZ    Okay.  Whatever it costs us and, ah, and
I will use police, our police, too.  And
that get, that can get to be expensive
because they get paid, our police get
paid the same rate as Chicago Police do.
And, and, I think you know what our,
what the CHA security force is, probably
better than I do.  But, uhm, uhm, that's
what we're gonna do and on, and on an
hourly basis.  Uhm, on another thing is,
is, I know this, I'm showing you a stack
of paper here.  You won't, I don't wanna
waste your time by going through every
one of these (UI), but this, these are
infractions for two months.  That's a
lot of infractions.  And infractions
means that the posts are not covered.
Alright?  Uhm, and that's of great
concern to me.  Ah, and that's, ah,
emphasized by the fact that it's a great
concern to our new chief operating
officer, so, ah, beyond how I feel about
it, I'm gonna be hearing from him.
Okay?  And so, I'm trying to tell you
ahead of time if we maintain these
levels of infractions, uhm, uhm, I'm
gonna be hearing from him and sometimes
whether I do or not, you're gonna be
hearing from me.  Uhm, so I would really
expect to see the level of these
infractions drop.  Ah, another problem
that we're having.  This is sort of
unique, ah, to Federal, ah, ah, we're
having difficult dealing with two month,
three month at a time billing.  Okay?
Ah, there's a lot of things that happen
there.  But one of the things that
happen is it causes a delay.  Okay?
Then you don't get paid right away
because we have to go through all of
this stuff first.  That's what B.J. does
over there.  And I do it here.  I don't,
I don't duplicate what she does, but we
have a system here that we use to check
on.  And when we get three months at a
time on the amount of posts that you
cover, this is an enormous task.  Okay?
And, ah, what we try and do to be fair
is we, we take the billings as they come
in, chronologically, in other words if
yours gets there Thursday and GEJ gets
there Friday, we're already into yours

3

| | | |
|---|---|---|
| 1 | | and we're doing yours. And because of |
| 2 | | the limited staff we have, ah, GEJ or |
| 3 | | somebody else has to wait some |
| 4 | | considerable time. So, it hurts them, |
| 5 | | too. And even though they're your |
| 6 | | competitors, ya know, I don't think, you |
| 7 | | must agree that that's really not fair |
| 8 | | to them. |
| | | |
| 9 | SKRZYPEK | Absolutely. |
| | | |
| 10 | MAERZ | Okay. Ah, and then they call BJ and |
| 11 | | then they call downtown, ah, which |
| 12 | | brings me to another point, and, and |
| 13 | | that is, ah, if you're not getting paid, |
| 14 | | ah, ah, because of they're telling you |
| 15 | | it's in my office or it's downtown or |
| 16 | | something like that, don't bother |
| 17 | | calling BJ 'cause she can't do anything |
| 18 | | about it. If you got a complaint about |
| 19 | | how you're, ya know, on, on, you're not |
| 20 | | getting your billings back, call this |
| 21 | | office. And either I or Mr. Kozak will |
| 22 | | talk to you. Okay? Because she can't |
| 23 | | do anything. Hers is the first step. |
| 24 | | Once it gets outta that office, she has |
| 25 | | no control over it at all. |
| | | |
| 26 | SKRZYPEK | I am unfamiliar with the procedures |
| 27 | | (UI). |
| 28 | | |
| 29 | MAERZ | Well, I'm trying to explain it, ya know, |
| 30 | | ya know, without, ah, without using a |
| 31 | | lot of time because the, if there's a |
| 32 | | bottleneck here it's gonna be here or |
| 33 | | it's gonna be downtown. Okay? And I'd |
| 34 | | like, I might even be able to help ya on |
| 35 | | that. Because if, if, ah, if they're |
| 36 | | not doing their job downtown like |
| 37 | | they're supposed to be doing, ah, I'm |
| 38 | | probably in a better position to get 'em |
| 39 | | to do it than you are. Okay? Ah, |
| 40 | | because, ah, uhm, because I know the |
| 41 | | people there. And another reason by |
| 42 | | virtue of my position. In other words, |
| 43 | | you're somebody calling, ah, that's a |
| 44 | | vendor and I'm somebody on the staff. |
| 45 | | Ah, but, the big thing is, is, is I |
| 46 | | don't want you bothering BJ. Okay? |
| 47 | | And, ah, ah, because she's got too much, |
| 48 | | she doesn't have the staff to do it. |
| 49 | | We're trying to increase the staff, |

| | | |
|---|---|---|
| 1 | | we're trying to get more, ah, |
| 2 | | coordinators, uhm, do you have any |
| 3 | | questions so far? |
| 4 | SKRZYPEK | (UI). |
| 5 | MAERZ | Okay. |
| 6 | | (UI). |
| 7 | MAERZ | The new contracts that are gonna come |
| 8 | | out, ah, I don't know exactly what |
| 9 | | they're gonna look like, I'll tell you |
| 10 | | this, they will have some penalty |
| 11 | | provisions in 'em.  Uhm, ah, but that's |
| 12 | | about all I can tell you.  (UI) anything |
| 13 | | else might change.  So, ah, I don't know |
| 14 | | what's gonna come out of those lawyer's |
| 15 | | offices anyway.  Ah, but these are, |
| 16 | | these are the big things... |
| 17 | SKRZYPEK | Do you have any idea if it's (UI)? |
| 18 | MAERZ | (UI) that, if they were to come out with |
| 19 | | this, ya know, when I, when I expected |
| 20 | | them we wouldn't be having this |
| 21 | | particular kind of conversation.  We'd |
| 22 | | be talking about the contract provision, |
| 23 | | but in the meantime, the new guy is |
| 24 | | coming in and he's all over my ass on |
| 25 | | this.  Ya know, he's hollering at me, |
| 26 | | ah, when the word, and then it didn't |
| 27 | | have anything to do with you, when the |
| 28 | | word came that another company that the |
| 29 | | guards were gonna walk off.  I mean, |
| 30 | | he's, he's up chewing on my ass. |
| 31 | SKRZYPEK | Right.   Yeah. |
| 32 | MAERZ | And making it very clear to me that he's |
| 33 | | not gonna tolerate that.  And that's |
| 34 | | when he said, (UI) ya know, I, he's |
| 35 | | saying, you got a plan?  I said, yeah, I |
| 36 | | got a plan.  Ya know, I have to replace |
| 37 | | it with some of our own people and |
| 38 | | that's when he told me, he said, if you |
| 39 | | have to do that, you charge the |
| 40 | | companies for 'em, for that, whatever it |
| 41 | | costs us to replace until, until you |
| 42 | | send, send the people around.  The thing |
| 43 | | is you can't send the same people back |
| 44 | | that left.  Okay?  So, you gotta find |

| | | |
|---|---|---|
| 1 | | somebody else and that's gonna take ya |
| 2 | | some time. And, ah, and, ah, in the |
| 3 | | meantime I've got either the police |
| 4 | | there or I've got CHA security force. |
| 5 | | Now I know that I'm not gonna be able to |
| 6 | | cover every post like that for the, for |
| 7 | | all of the posts that we got, not just |
| 8 | | yours. And there are some of them that |
| 9 | | are gonna be vacant, that I'm not gonna |
| 10 | | do it, but those that I can do, I will. |
| 11 | | There was a, there was another thing I |
| 12 | | wanted to (UI). |
| | | |
| 13 | DAVIS | Uhm, incident reports. |
| | | |
| 14 | MAERZ | Oh. We seem to be having a lot of |
| 15 | | problems on getting incident reports out |
| 16 | | of Federal. And, and I remember when, |
| 17 | | ya know, when I was Inspector General we |
| 18 | | seemed to have that problem, too, uhm, |
| 19 | | ah, why don't we, to avoid a |
| 20 | | confrontation on this issue, I would |
| 21 | | really appreciate if you could see that |
| 22 | | we get the incidents reports. |
| | | |
| 23 | SKRZYPEK | I have, uhm, instructed my staff that as |
| 24 | | soon as there is a request for |
| 25 | | documents, sometimes, uh, the reports, |
| 26 | | are either still out in the field, they |
| 27 | | have not been, ah, brought back to our |
| 28 | | control center, and I have had not, not |
| 29 | | had an opportunity to read them or |
| 30 | | review them prior to them signing off. |
| 31 | | One of the largest and major incidents |
| 32 | | that precipitated the fact that I must |
| 33 | | approve any paperwork coming out of the |
| 34 | | office and not leave this to |
| 35 | | subordinates is a very serious incident |
| 36 | | that we had, ah, I think it was last |
| 37 | | year or, ah, it had to be a year to |
| 38 | | eighteen months ago, and one of our |
| 39 | | commanders, they received a call |
| 40 | | reportedly from a CHA official and that |
| 41 | | particular official instructed the |
| 42 | | commander to list the buildings that he |
| 43 | | had that were abandoned, excuse me, not |
| 44 | | abandoned, that were with only one |
| 45 | | particular individual on a post. The |
| 46 | | individual calling had told him we know |
| 47 | | of three right now that are completely |
| 48 | | abandoned, so please put 'em down. He |
| 49 | | went ahead, listed the buildings as |

6

|  |  |  |
|---|---|---|
| 1 |  | abandoned, sent the communication to |
| 2 |  | Contract Security and it wound up in the |
| 3 |  | chairman's hands.  Subsequent to the |
| 4 |  | investigation, we not only found out |
| 5 |  | that the buildings were not abandoned, |
| 6 |  | but they had the full contingency of |
| 7 |  | personnel.  He not only was chastised |
| 8 |  | disciplined, but he was instructed and |
| 9 |  | all personnel were instructed that not |
| 10 |  | one single paper will go out of this |
| 11 |  | office without my approval.  And that |
| 12 |  | simply is a safeguard, not only to you, |
| 13 |  | but also to myself because as I |
| 14 |  | understand it, the chairman was |
| 15 |  | extremely vocal about it, and this |
| 16 |  | precipitated that incident and he was |
| 17 |  | called on the carpet and it was probably |
| 18 |  | one of the most serious incidents that I |
| 19 |  | had here and no one could remember who |
| 20 |  | said what to who and I said, time out, |
| 21 |  | fellas, this is not the way to run a |
| 22 |  | railroad.  You do things in succession |
| 23 |  | in an organization in order of chain of |
| 24 |  | command.  You're all police officers or |
| 25 |  | former police officers and I spent |
| 26 |  | twenty three years in the police |
| 27 |  | department.  As a patrolman I don't take |
| 28 |  | a piece of paper and put it in the fax |
| 29 |  | machine and send it to the, to a, to an |
| 30 |  | outside agency.  This must be approved |
| 31 |  | by the chain of command.  (Coughs). |
| 32 |  | What I will do, and I promise you this, |
| 33 |  | that I will do my utmost when I receive |
| 34 |  | a request for (UI) I will expedite this |
| 35 |  | as quickly as possible.  It's nothing |
| 36 |  | I'm log jamming or trying to withhold |
| 37 |  | information, but I think you can |
| 38 |  | understand my position after this |
| 39 |  | incident occurred. |
| 40 | MAERZ | Well, I, ..... |
| 41 | SKRZYPEK | I said that's it.  I need to look at |
| 42 |  | what is going out of this office because |
| 43 |  | it's on my letterhead and I have, ah, an |
| 44 |  | underlying liability for anything that |
| 45 |  | goes out, that must seen by myself.  I |
| 46 |  | can't even comment on the document |
| 47 |  | unless I know what it's about. |
| 48 | DAVIS | Right.  Right.  Do you mind? |

| | | |
|---|---|---|
| 1 | MAERZ | Go ahead. |
| 2<br>3<br>4<br>5 | DAVIS | But again, there are times where incidents have occurred where we can call someone (UI) I have to report it to the proper (UI). |
| 6 | SKRZYPEK | I understand. |
| 7<br>8 | DAVIS | And you, you know, it just goes all (UI). |
| 9 | SKRZYPEK | But we're, we're... |
| 10 | | (UI). |
| 11<br>12 | SKRZYPEK | ...(UI) is correct, what I'm giving you are not correct and you give it to him. |
| 13 | | Yeah, but see he's (UI). |
| 14<br>15 | MAERZ | Wait, wait, wait a minute, what we're talking about is, is reasonable time. |
| 16 | SKRZYPEK | Oh, I agree with you, you know? |
| 17<br>18 | MAERZ | I mean I'm not gonna tell you how to, how to manage your business. |
| 19 | SKRZYPEK | Right. |
| 20<br>21 | MAERZ | Okay?  But, ah, I mean, if everything's gotta go through one person... |
| 22 | DAVIS | Yeah, that's... |
| 23<br>24 | MAERZ | ...Ya know, it gets, it gets to be sort of a log, logjam thing. |
| 25 | SKRZYPEK | Right. |
| 26<br>27<br>28 | MAERZ | I would, I would think that there might be one other person, 'cause I mean, you might be on vacation or something. |
| 29<br>30<br>31 | SKRZYPEK | Well, what, what I usually do is leave it up to our vice-president, ah, either, ah, Mr. Perez or Mr. Short. |
| 32<br>33 | DAVIS | (UI) and they don't call me back sometimes. |

8

| | | |
|---|---|---|
| 1<br>2 | SKRZYPEK | They are going to get instructed today to call you back immediately. |
| 3 | DAVIS | That's fair enough. |
| 4<br>5<br>6<br>7 | SKRZYPEK | And please, even if, if I'm not even near a fax machine and you can tell me what it, what this is about in twenty five words or less... |
| 8 | MAERZ | Yeah. |
| 9 | SKRZYPEK | ...Go ahead and send it. |
| 10 | MAERZ | Yeah. |
| 11<br>12<br>13<br>14<br>15 | SKRZYPEK | But if it's something not, not true, I vowed that day forward that this will never ever, ever, ever happen again 'cause it came right down from the chairman and he was totally... |
| 16 | MAERZ | No. |
| 17 | SKRZYPEK | ...Totally outraged and it was... |
| 18 | MAERZ | (UI) I understand (UI). |
| 19<br>20<br>21<br>22<br>23<br>24<br>25 | SKRZYPEK | ...Something that I let slip through the cracks and I gave too much authority, when somebody can take a, a memo that says Federal Security and put it there and what you've got are factual statements, wait a minute, it comes from my office before it is released... |
| 26 | MAERZ | Alright. |
| 27<br>28 | SKRZYPEK | ...I have an underlying liability to answer (UI)... |
| 29 | MAERZ | No, I, listen... |
| 30<br>31 | SKRZYPEK | But I'm not here to logjam ya.  It'll be done.  It'll be done. |
| 32<br>33<br>34 | MAERZ | Alright.  Listen, I can understand getting scorched.  Ya know, because it, I think it's happened to all of us. |
| 35 | DAVIS | Yeah. |

9

| | | |
|---|---|---|
| 1 | MAERZ | And, and, and, ya know, then, ah, you... |
| 2 | SKRZYPEK | You learn your lesson. |
| 3 | MAERZ | ...You be sure to keep the flame. |
| 4 | SKRZYPEK | You learn your lesson. |
| 5 6 7 | MAERZ | Boy, but then, you know, you, you gotta be careful you don't go beyond the point of diminishing returns on (UI). |
| 8 9 10 11 | SKRZYPEK | This particular incident could of, could have taken place from possibly even someone in, on this department or somebody... |
| 12 | MAERZ | Yeah, (UI). |
| 13 14 15 16 17 | SKRZYPEK | ...Ah, another competitor that thought they were funny in doing this.  And, and what he did is he bit and he took the bait.  And what, what, what the result was it was a catastrophe. |
| 18 | UNKNOWN MALE (U/M) | It certainly was. |
| 19 | MAERZ | Okay. |
| 20 21 22 | DAVIS | Uhm, one other thing director (UI). Jim, all of you guys are supposed (UI) have you driven down (UI)? |
| 23 | SKRZYPEK | Yes, I have. |
| 24 | DAVIS | Have you seen them? |
| 25 26 27 28 29 30 | SKRZYPEK | I've seen guys outside of, of the door and that's why this is carried with me twenty four hours a day and I'll call the supervisor and order those guys back into the building.  I have an officer shot, ah, was it last week? |
| 31 | U/M | Uh huh. |
| 32 | KOZAK | Ah, a lieutenant. |
| 33 | MAERZ | Yeah. |
| 34 35 | SKRZYPEK | And I, I've given strict orders no matter how warm it is, and have gone |

10

| | | |
|---|---|---|
| 1 | | over the radio continuously no matter |
| 2 | | how warm it is, stay inside the |
| 3 | | buildings.  Don't, you are not to be |
| 4 | | outside the doors.  I realize it's hot, |
| 5 | | but it's more uncomfortable to have a |
| 6 | | bullet inside of you than to be standing |
| 7 | | outside and just being uncomfortable |
| 8 | | from the weather. |
| | | |
| 9 | MAERZ | Yeah. |
| | | |
| 10 | SKRZYPEK | Okay?  So, my, my presence is well known |
| 11 | | and I bark on that thing continuously |
| 12 | | and you know, you do have incidents and |
| 13 | | I, and I do agree with you, there are, |
| 14 | | when I confront 'em, well, I was only |
| 15 | | going to the washroom, there's no |
| 16 | | washroom in the building, I had to |
| 17 | | relieve myself, and it's a constant, |
| 18 | | constant back and forth, and we're |
| 19 | | trying to keep the lid on it as much as |
| 20 | | we can. |
| | | |
| 21 | DAVIS | You know because I see them, I see them |
| 22 | | in restaurants and down State Street.  I |
| 23 | | seen them in McDonald's... |
| | | |
| 24 | SKRZYPEK | Whenever that's done, they're severely, |
| 25 | | severely disciplined. |
| | | |
| 26 | DAVIS | Usually what I do is call, uh, uh, forty |
| 27 | | seventh street office... |
| | | |
| 28 | SKRZYPEK | If that occurs, please let me know |
| 29 | | immediately. |
| | | |
| 30 | DAVIS | Yeah. |
| | | |
| 31 | SKRZYPEK | We try our best. |
| | | |
| 32 | DAVIS | Okay.  Ah, that's about, that's about, |
| 33 | | well, you, you, I just, I just wanna go |
| 34 | | back, for just a half a second, and, and |
| 35 | | share something with you.  When you, |
| 36 | | when you're backlogged with, with your |
| 37 | | invoices, then I have to give my staff |
| 38 | | overtime. |
| | | |
| 39 | SKRZYPEK | Okay. |
| | | |
| 40 | DAVIS | So... |

11

| 1 | SKRZYPEK | Which you're proving, Oh, oh, my |
| 2 | | confession to you and everybody (UI) |
| 3 | | that I've said it, I can't balance my |
| 4 | | checkbook.  If Janice wasn't here, I'd |
| 5 | | be in foam rubber city right now, |
| 6 | | bouncing off the walls.  I can't do it. |
| 7 | | (LAUGHING) |
| 8 | U/M | Foam rubber city. |
| 9 | SKRZYPEK | I can not (UI) right now... |
| 10 | MAERZ | Janice, Janice is your wife? |
| 11 | SKRZYPEK | Janice is my wife. |
| 12 | MAERZ | Oh, okay. |
| 13 | SKRZYPEK | If, if, she knows where every dime and |
| 14 | | every penny is, and if a guy calls her |
| 15 | | six months ago and says, listen, you |
| 16 | | didn't put twenty dollars in my check, |
| 17 | | she knows it right to the penny, because |
| 18 | | she's got a trap mind.  She's working, |
| 19 | | she's been working in banking and she |
| 20 | | knows this.  I only say, look, they're, |
| 21 | | they're calling me, they're hot on this, |
| 22 | | can you speed this thing up?  And |
| 23 | | whatever she does and however she does |
| 24 | | it, ah... |
| 25 | DAVIS | Normally it's not Jim or Jan didn't |
| 26 | | call.  Well, Jan calls every once in a |
| 27 | | while about them invoice, but Perez. |
| 28 | SKRZYPEK | Perez.  You'll never see me calling |
| 29 | | about invoices or anything 'cause I |
| 30 | | don't... |
| 31 | DAVIS | No. |
| 32 | SKRZYPEK | ...What the hell I'm doing.  I'm an |
| 33 | | operations man.  I'm out in the field. |
| 34 | MAERZ | (UI) Ordinarily, and I'm not asking you |
| 35 | | to conform with what other companies are |
| 36 | | doing.  But, ordinarily, you know, we |
| 37 | | get billings from them every pay period. |
| 38 | | And, ah, and, ah, some of them I think |
| 39 | | are not in as good as fiscal condition |
| 40 | | as you are, and, ah, ah, so, it, it can |
| 41 | | hurt them, too, when they have... |

12

| | | |
|---|---|---|
| 1<br>2 | SKRZYPEK | I understand that.  And you're right<br>about the earlier comments, it's... |
| 3 | MAERZ | But the big thing is... |
| 4 | SKRZYPEK | Is not fair. |
| 5<br>6<br>7<br>8 | MAERZ | ...Is, is we wanna, we wanna provide you<br>with the service, too, I mean, we don't<br>want you to, to, to wait three months to<br>get paid. |
| 9 | SKRZYPEK | No; no. |
| 10<br>11 | MAERZ | But then again, don't wait three months<br>to bill us either.  Okay? |
| 12<br>13<br>14 | DAVIS | And, and whoever you have checking your<br>invoices to make sure they don't use<br>people that are on the barred list. |
| 15 | MAERZ | That they don't what? |
| 16 | DAVIS | Use persons that are on the barred list. |
| 17 | MAERZ | Oh, yeah. |
| 18 | DAVIS | (UI).  Which you get every month, Jim. |
| 19<br>20<br>21 | SKRZYPEK | Yeah, definitely.  That's distributed.<br>'Cause every time we get it, it is<br>distributed all over the the company. |
| 22<br>23 | MAERZ | Yeah, watch, watch your, ah, watch your<br>time sheets.  Okay? |
| 24 | SKRZYPEK | Alright.  Thanks I appreciate it. |
| 25 | | (UI) on a, ah... |
| 26 | | (UI). |
| 27 | | (STATIC) |
| 28 | | (UI) pay (UI). |
| 29 | | (LAUGHING) |
| 30 | | (UI)  Yeah, (UI) yeah.  Thanks. |
| 31<br>32 | SKRZYPEK | Thanks a million.  (UI) mention (UI).<br>Thanks (UI). |

```
 1                          (UI).

 2    SKRZYPEK              Yeah, thanks a million.  One hundred to
 3                          one oh two direct.

 4                          (UI).

 5                          (STATIC)

 6    KOZAK                 What kind of car?

 7    SKRZYPEK              He's got the Lexus.  One hundred to one
 8                          ah, two direct.

 9    KOZAK                 There he is.

10    SKRZYPEK              Oh.

11    KOZAK                 Here he is.

12    SKRZYPEK              Great.  Real good.  Rick, a pleasure.
13                          Thank you.  Appreciate everything you do
14                          (UI).
```

DATE:            10/17/94
TIME:            ON:  11:45 A.M.
ACTIVITY:        TELEPHONIC MONITORING

SPEAKERS:
       KOZAK:         Richard Kozak
    SKRZYPEK:         James R. Skrzypek
          UF:         Unknown Female

                 *      *      *      *      *

| 1  |          | (Dial tone)                    |
| 2  |          | (Phone dialing)                |
| 3  |          | (Phone ringing)                |
| 4  | UF       | Federal.                       |
| 5  | KOZAK    | Hi, Jim Skrzypek please.       |
| 6  | UF       | Who's calling?                 |
| 7  | KOZAK    | Rick Kozak.                    |
| 8  | UF       | Rick...Rick Hozak?             |
| 9  | KOZAK    | Kozak.                         |
| 10 | UF       | Hold on a second, okay?        |
| 11 | KOZAK    | Okay.                          |
| 12 |          | (Pause in conversation)        |
| 13 | SKRZYPEK | Skrzypek.                      |
| 14 | KOZAK    | Jim.                           |
| 15 | SKRZYPEK | Yeah.                          |
| 16 | KOZAK    | Rick Kozak.                    |
| 17 | SKRZYPEK | Hey Rick, how you been?        |
| 18 | KOZAK    | Alright, how are you?          |
| 19 | SKRZYPEK | What's goin' on?               |
| 20 | KOZAK    | I got a little problem.        |
| 21 | SKRZYPEK | Yeah.                          |

1


GOVERNMENT
EXHIBIT

B

| | | |
|---|---|---|
| 1 | KOZAK | Ahhhm, I...I just saw Jose... |
| 2 | SKRZYPEK | Okay. |
| 3 4 | KOZAK | ...and uh, I talked to him last week too... |
| 5 | SKRZYPEK | Okay. |
| 6 7 | KOZAK | ...uhm, this uh, this check for Nancy... |
| 8 | SKRZYPEK | ·Okay. |
| 9 10 11 12 | KOZAK | ...the...you know, I'm...I'm gettin' a little bit of uhm, uh, she's not bein' paid uh, what was originally agreed upon. |
| 13 | SKRZYPEK | Nancy is who? |
| 14 15 | KOZAK | Nancy is my girlfriend who's on...on the payroll. |
| 16 | SKRZYPEK | She's on the payroll? |
| 17 | KOZAK | Yes. |
| 18 19 | SKRZYPEK | Wait a minute with uh, when did...when did she start? |
| 20 21 | KOZAK | (Stutters) This is per Jose.  She started uh, 'bout uh, two months ago. |
| 22 23 | SKRZYPEK | Holy fuck.  I wish somebody'd tell me somethin' (laughs). |
| 24 | KOZAK | Yeah. |
| 25 26 27 | SKRZYPEK | I wish somebody would uh, let me know what's goin' on.  Uhh, was there a dispute in the pay or somethin'? |
| 28 | KOZAK | Yeah.  Yeah. |
| 29 30 31 32 | SKRZYPEK | Uh, why don't I do this, uh, Rick, let me get a hold of uh, him or Janice and where are you at?  What number are you at? |
| 33 | KOZAK | I'm in the office. |

2

1 SKRZYPEK          Hold on a second Rick, hold on.
2                   (Sigh) go ahead with it.  Go ahead
3                   with your number.

4 KOZAK             Three two si...uh, it's three one
5                   two.

6 SKRZYPEK          Yeah.

7 KOZAK             Three two six.

8 SKRZYPEK          Three two six.

9 KOZAK             Two seven two seven.

10 SKRZYPEK         Two seven two seven.

11 KOZAK            Just ask for me, I mean, I...I don't
12                  have a direct number.

13 SKRZYPEK         Yeah, no, no problem Rick.  Let me
14                  find out what the...what the fuck is
15                  goin' on.  I wasn't even aware she
16                  was workin' for me.  Let me uh, let
17                  me call him.

18 KOZAK            Alright, thanks.

19 SKRZYPEK         Bye.

20 KOZAK            Bye.

3*

```
DATE:                10/19/94
TIME:                ON:   9:45 A.M.
ACTIVITY:            TELEPHONIC MONITORING

SPEAKERS:
     PEREZ:          JOSE PEREZ
     SKRZYPEK:       JANICE SKRZYPEK


            *        *        *        *
```

| | | |
|---|---|---|
| 1 | | (PHONE RINGING) |
| 2 | SKRZYPEK: | Hello. |
| 3 | PEREZ: | Hi boss. |
| 4 | SKRZYPEK: | Hi baby. |
| 5 | PEREZ: | How are you? |
| 6 | SKRZYPEK: | Fine. |
| 7<br>8 | PEREZ: | Good.  Uh, listen I just had a meeting<br>with Kozak. |
| 9 | SKRZYPEK: | Yeah. |
| 10 | PEREZ: | He's fucking pissed off. |
| 11 | SKRZYPEK: | Why? |
| 12 | PEREZ: | Uh, he wants an increase. |
| 13<br>14 | SKRZYPEK: | Uh, lets not talk about this over the<br>phone sweetheart. |
| 15 | PEREZ: | Okay, sorry. |
| 16 | SKRZYPEK: | Okay. |
| 17 | PEREZ: | Okay.  Uhm, can we meet tonight? |
| 18 | SKRZYPEK: | Yeah, uhm, where are you now? |
| 19<br>20 | PEREZ: | I just finished meeting with him, I'm on<br>my way to the office. |
| 21<br>22 | SKRZYPEK: | Okay, alright, you know you got all<br>those men there for the funeral. |

1

GOVERNMENT
EXHIBIT

CARDELS 800-780-0599

C

| | | |
|---|---|---|
| 1 2 | SKRZYPEK: | Okay, alright, you know you got all those men there for the funeral. |
| 3 | PEREZ: | Yeah, shit it's almost there. |
| 4 | SKRZYPEK: | Okay. |
| 5 6 | PEREZ: | Okay, I'll call them right now so they can send 'em over. |
| 7 8 9 | SKRZYPEK: | Okay, you know what?  I'm taking Tony to the, uhm, Ernie's pickin' up Tony right now. |
| 10 | PEREZ: | Okay. |
| 11 12 | SKRZYPEK: | And we're, uhm, I'm almost to the hospital because I got. |
| 13 | PEREZ: | What happened? |
| 14 15 | SKRZYPEK: | No, no, no Tony's just going for a checkup. |
| 16 | PEREZ: | Okay. |
| 17 | SKRZYPEK: | At St. Lukes. |
| 18 | PEREZ: | Okay. |
| 19 20 21 | SKRZYPEK: | So I can probably meet you after that if you want to, if you got what twenty minutes to spare. |
| 22 | PEREZ: | Fine, fine. |
| 23 | SKRZYPEK: | Okay? |
| 24 | PEREZ: | No problem. |
| 25 26 27 | SKRZYPEK: | Uhm, so just stick around because all you got to do is hop on the expressway and you can come straight down, uh. |
| 28 | PEREZ: | No problem. |
| 29 | SKRZYPEK: | Okay? |
| 30 | PEREZ: | Give me a page. |
| 31 | SKRZYPEK: | You got it. |

2

1     PEREZ:              Bye.

      SKRZYPEK:           Bye.

3                         (CONVERSATION TERMINATED)

3

# EXHIBIT   6

Government Exhibit A

1.  <u>Page 1</u>

        TIME:              OFF: 3:38 P.M.
        SPEAKERS:
        SHOUP:           SA JOHN ROBERT SHOUP

        SA JOHN ROBERT
        SHOUP (SHOUP)     This is Special Agent JOHN ROBERT SHOUP
                          with the FEDERAL BUREAU OF
                          INVESTIGATION, also in the presence of
                          Special Agent CONNIE REDDEN. The date
                          is September 21, 1994. The time is 2:2,
                          2:35 P.M. A body recorder has been, has
                          been placed in the possessionn of RICHARD
                          KOZAK  in anticipation of a meeting this
                          date with CHRIS MAERZ, B.J. DAVIS, and
                          JIM SKRZYPEK of FEDERAL SECURITY. The
                          recorder will be left in Mr. KOZAK's
                          possession and will be turned on at such
                          time as when the meeting begins.

        RICHARD KOZAK
        (KOZAK)           This is Richard S. Kozak. The date is
                          the twenty first of September, nineteen
                          ninety four. The time is 3:15. I am
                          turning on the reocrder (UI) and the
                          recorder will stay on until the
                          conclusion.

                          (LONG PAUSE)

**(Deleted, D/A Ex.4 Pg.1)**

2. <u>Page 2, Ln.17</u>

        SKRZYPEK         Do you have any idea <u>**if it's**</u> (UI)?

**(Added, D/A Ex.4 Pg.5, Ln.42)**

3

3. Page 5, Ln.42

      MAERZ                    send, send the people **around**.

**(Added, D/A Ex.4 Pg.6, Ln.23)**

4. Page 6, Lns.24,25

      SKRZYPEK           there is a request for documents,
                              **[incident reports put back in (UI)]**

**(Added/Deleted, D/A Ex.4 Pg.7, Lns.2,3)**

5. Page 7, Ln.21

      SKRZYPEK           fellas, **(now listen,)** ........

**(Deleted, D/A Ex.4 Pg.7, Ln.48)**

6. Page 7, Lns. 24-27

      SKRZYPEK           You're all police officers or former
                              police officers and I spent twenty
                              three years in the police department.
                              **[You all police officers (UI) police**
                              **officers that I spent twenty three**
                              **years in the police department.]**

**(Changed, ·D/A Ex.4 Pgs.7-8, Lns.51,52-1,2)**

7. Page 7, Ln.36

      SKRZYPEK           I'm **log** jamming .....

**(Added, D/A Ex.4 Pg.8, Ln.11)**

8. Page 7, Ln.40

      MAERZ                    Well, I, ..... **[I said that's it.]**
   **\*\*\* [DAVIS] \*\*\***

**(Different Speaker Added, D/A Ex.4 Pg.8 Ln.15)**

9. Page 7, Ln.41

      SKRZYPEK           **[I said that's it.]** I need to look at

**(Deleted, D/A Ex.4 Pg.8 Ln.16)**

10. <u>Page 10, Ln.34</u>

       SKRZYPEK           And I, I've given **[<u>strict orders</u>]** ...

**(Added, D/A Ex.4 Pg.11, Ln.16)**

11. <u>Page 11, Lns.26,27</u>

       DAVIS              Usually what I do is call, uh, uh,
                             forty seventh street office...
                             **[<u>Usually what I do is call, uh, uh,</u>**
                             **<u>forty second street office...</u>]**

**(Changed/Deleted Street Number, D/A Ex.4 Pg.12, Lns.3,4)**

12. <u>Page 13, Ln.24</u>

       SKRZYPEK           Alright. Thanks **[I appreciate it.]**

**(Added, D/A Ex.4 Pg.14, Ln.8)**

13. <u>Page 14, Ln.2</u>

       SKRZYPEK           Yeah, thanks a million. One hundred to
                             one oh two direct. **[<u>Thanks a million.</u>**
                             **<u>(UI) mention (UI). Thanks (UI).</u>]**

**(Changed/Added/Deleted, D/A Ex.4 Pg.14, Lns.15,16)**

14. <u>Page 14, Ln.6</u>

       KOZAK              What kind of car?

**(DOES NOT APPEAR, D/A Ex.4 Pg.14)**

15. <u>Page 14, Ln.7</u>

       SKRZYPEK           (UI) He's got the Lexus.
       **U/M**

**(Deleted, D/A Ex.4 Pg.14, Ln.21)**

16. <u>Page 14. Lns.7,8</u>

       SKRZYPEK           He's got the Lexus. One hundred to
                               one ah; two **direct**. **[<u>One hundred to</u>**
                             **<u>one oh two.(UI)</u>]**

**(Speaker Changed/Added, D/A Ex.4 Pg.14, Ln.22)**

5

17. <u>Page 14, Lns.12-14</u>

    SKRZYPEK                 Great. Real Good. Rick, a pleasure.
                                    Thank you. Appreciate everything you do
                                    (UI). **[Rick, a pleasure (UI) I
appreciate everything you are doing
(UI).**

                                    **(STATIC)**

**(Changed/Added,D/A Ex.4 Pg.14, Lns.26-29)**

18. <u>Page 15, MISSING</u>

                          **(MUSIC PLAYING)**

               **(CONVERSATION TERMINATED)**

    KOZAK                   **The time is 3:38. The meeting has
concluded and I am going to shut the
recorder off.**

**(Deleted/D/A Ex.4 Pg.15, Lns.1-5)**

                    <u>Government Exhibit B</u>

19. <u>Page 1</u>

        TIME:                 OFF:  11:48 A.M.

        SA JOHN SHOUP        This is Special Agent John Robert
                                    Shoup of the Federal Bureau of
                                    Investigation. Also in the presence
                                    of Special Agent Tim Hepperman I'm
                                    here with Richard Kozak who is going
                                    to place a telephone call to Jim
                                    Skrzypek of Federal Security at
                                    telephone number (312) 774-7002. The
                                    date is October seventeenth, 19 94.
                                    The time is eleven - forty-five a.m.

**(Deleted, D/A Ex.5 Pg.1, Lns.1-10)**

20. <u>Page 2, 18.19</u>

        SKRZYPEK               **Wait a minute** with uh, when
                                      did...when did she start?

**(Added, D/A Ex.5 Pg.2, Lns.26,27)**

6

21. Page 4, __MISSING__

                              (Conversation terminated)

          SA SHOUP            This is Special Agent John Robert
                              Shoup. That concluded the call. The
                              time is 11:48 a.m. The file number
                              is 147A-CG-92714.

(Deleted, D/A Ex.5 Pg.4, Lns.1-8)

                        Government Exhibit C

22. Page 1

          TIME:               OFF:  9:48 A.M.

          SPEAKERS:           SA JOHN SHOUP

          SHOUP:              This is Special Agent John Robert Shoup
                              of the Federal Bureau of Investigation.
                              I'm here with, also in the presence of
                              Special Agent Terry Moody, Im here with
                              Jose Perez, who's going to place a
                              telephone call to Janice Skrzypek at
                              telephone number 312/607/9094. The date
                              is October 19, 1994, the time is 9:48
                              a.m.*

(Deleted, D/A Ex.1 Pg.1, Lns.1-9)

23. Page 1, Lns.21,22
    Page 2, Lns. 1, 2

          SKRZYPEK            Okay, alright, you know you got all
                              those men there for the funeral.

(Repeated Twice, D/A Ex.1 Pg.2, Lns.6,7)

24. Page 3

          SHOUP:              This is John Robert Shoup that concludes
                              the call. The time is 9:45 a.m.** File
                              number is 147-CG-92714.

———————————————
*     Start and stop times REVERSED.
**    Stop and start times REVERSED.

                              7

DATE:                    9/21/94
                         ON:   2:45 P.M.
TIME:                    OFF:  3:38 P.M.
ACTIVITY:                CONSENSUAL MONITORING

SPEAKERS:
     SHOUP:              SA JOHN ROBERT SHOUP
     KOZAK:              RICHARD KOZAK
     DAVIS:              BARBARA DAVIS
     MAERZ:              CHRISTIAN MAERZ
     SKRZYPEK:           JAMES SKRZYPEK


                    *    *    *    *


| Line | Speaker | Text |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14 | SA JOHN ROBERT<br>SHOUP (SHOUP) | This is Special Agent JOHN ROBERT SHOUP with the FEDERAL BUREAU OF INVESTIGATION, also in the presence of Special Agent CONNIE REDDEN.  The date is September 21, 1994.  The time is 2:2, 2:35 P.M.  A body recorder has been, has been placed in the possession of RICHARD KOZAK in anticipation of a meeting this date with CHRIS MAERZ, B. J. DAVIS, and JIM SKRZYPEK of FEDERAL SECURITY.  The recorder will be left in Mr. KOZAK's possession and will be turned on at such time as when the meeting begins. |
| 15<br>16<br>17<br>18<br>19<br>20<br>21 | RICHARD KOZAK<br>(KOZAK) | This is Richard S. Kozak.  The date is the twenty first of September, nineteen ninety four.  The time is 3:15.  I am turning on the recorder (UI) and the recorder will stay on until the conclusion. |
| 22 | | (LONG PAUSE) |
| 23<br>24 | CHRIS MAERZ<br>(MAERZ) | This is Mr. Kozak. |
| 25<br>26 | JAMES SKRZYPEK<br>(SKRZYPEK) | We've met already. |
| 27 | KOZAK | I just, I just... |
| 28<br>29<br>30 | MAERZ | Oh, you already met?  Oh, okay.  Uhm, I'll try not to take up too much of your time (UI). |

1

**"EXHIBIT 4"**

| | | |
|---|---|---|
| 1 | SKRZYPEK | One of my cards. |
| 2<br>3<br>4<br>5 | MAERZ | Thank you.  Uhm, but there's, ah, a few things that we oughta talk about and I wanna make it clear that I'm not picking you out. |
| 6 | SKRZYPEK | Okay. |
| 7 | MAERZ | 'Cause GEJ was here yesterday. |
| 8 | SKRZYPEK | Oh, good. |
| 9 | MAERZ | And T force gonna be here tomorrow. |
| 10 | SKRZYPEK | Okay. |
| 11<br>12 | MAERZ | And we're discussing pretty much the same issues. |
| 13 | SKRZYPEK | Okay. |
| 14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28<br>29<br>30<br>31<br>32<br>33<br>34<br>35<br>36<br>37<br>38<br>39<br>40<br>41<br>42<br>43 | MAERZ | Uhm, there's a new, as you, as I'm sure you know, there's a new chief operating officer here.  Uhm, Mr. Grady, who has given, ah, given us certain kinds of instructions.  Uhm, which I thought that, ah, ah, at least for those three companies right now I wanna discuss because they have the most, ah, fall into these categories.  First thing is, is, uhm, ah, (Pause) what I'm gonna try and do as much as I can when we find the guards have, have abandoned a post.  I will try to replace them with CHA security force.  Until we can get ah, get replacement contract people in there.  Alright?  His position is, is that, is that for the period of time that we have to provide our people, you're gonna pay for it.  Okay?  The second thing is, uhm, ah, and this, and we've done this with GEJ, so, ah, is that if we, if the guards abandoned their post and we have to provide coverage like that, the ones who abandon the posts are fired.  We don't want 'em back on the properties.  Ah, and actually this is, this is really sort of an interim measure.  You know, I, I, at first I had thought that I wasn't gonna, ah, wasn't gonna do it at all because we |

2

had a new contract, I mean, and there
are, there are some sanctions built into
that contract.  Penalties.  Ah, I, I'm
not at liberty to discuss all of it
because it may change and it's laying up
in the lawyer's offices and it's been
laying there and I don't know how long
it's gonna be there, so I have to, I
have to apply this.  So, there's gonna
be, ah, there's going to be some, ah,
some penalties on the, when the posts
aren't covered.  Ah, our position is, is
that, ah, we are sensitive to a lot of
your problems.  We, but still we're in a
position where we, where we have a
responsibility to the, ah, to the
residents and, ah, companies that
contract to cover the posts.  (Coughs).
And that's what and we want the posts
covered, and if you can't and we can,
and you contracted for that, if we have
to cover 'em, you're gonna be charged
for it.

SKRZYPEK        I understand.

MAERZ           Okay.  Whatever it costs us and, ah, and
I will use police, our police, too.  And
that get, that can get to be expensive
because they get paid, our police get
paid the same rate as Chicago Police do.
And, and, I think you know what our,
what the CHA security force is, probably
better than I do.  But, uhm, uhm, that's
what we're gonna do and on, and on an
hourly basis.  Uhm, on another thing is,
is, I know this, I'm showing you a stack
of paper here.  You won't, I don't wanna
waste your time by going through every
one of these (UI), but this, these are
infractions for two months.  That's a
lot of infractions.  And infractions
means that the posts are not covered.
Alright?  Uhm, and that's of great
concern to me.  Ah, and that's, ah,
emphasized by the fact that it's a great
concern to our new chief operating
officer, so, ah, beyond how I feel about
it, I'm gonna be hearing from him.
Okay?  And so, I'm trying to tell you
ahead of time if we maintain these
levels of infractions, uhm, uhm, I'm

3

gonna be hearing from him and sometimes whether I do or not, you're gonna be hearing from me.  Uhm, so I would really expect to see the level of these infractions drop.  Ah, another problem that we're having.  This is sort of unique, ah, to Federal, ah, ah, we're having difficult dealing with two month, three month at a time billing.  Okay?  Ah, there's a lot of things that happen there.  But one of the things that happen is it causes a delay.  Okay?  Then you don't get paid right away because we have to go through all of this stuff first.  That's what B.J. does over there.  And I do it here.  I don't, I don't duplicate what she does, but we have a system here that we use to check on.  And when we get three months at a time on the amount of posts that you cover, this is an enormous task.  Okay?  And, ah, what we try and do to be fair is we, we take the billings as they come in, chronologically, in other words if yours gets there Thursday and GEJ gets there Friday, we're already into yours and we're doing yours.  And because of the limited staff we have, ah, GEJ or somebody else has to wait some considerable time.  So, it hurts them, too.  And even though they're your competitors, ya know, I don't think, you must agree that that's really not fair to them.

SKRZYPEK        Absolutely.

MAERZ           Okay.  Ah, and then they call BJ and then they call downtown, ah, which brings me to another point, and, and that is, ah, if you're not getting paid, ah, ah, because of they're telling you it's in my office or it's downtown or something like that, don't bother calling BJ 'cause she can't do anything about it.  If you got a complaint about how you're, ya know, on, on, you're not getting your billings back, call this office.  And either I or Mr. Kozak will talk to you.  Okay?  Because she can't do anything.  Her's is the first step.

| | | |
|---|---|---|
| 1 | | Once it gets outta that office, she has |
| 2 | | no control over it at all. |
| | | |
| 3 | SKRZYPEK | I am unfamiliar with the procedures |
| 4 | | (UI). |
| | | |
| 5 | MAERZ | Well, I'm trying to explain it, ya know, |
| 6 | | ya know, without, ah, without using a |
| 7 | | lot of time because the, if there's a |
| 8 | | bottleneck here it's gonna be here or |
| 9 | | it's gonna be downtown.  Okay?  And I'd |
| 0 | | like, I might even be able to help ya on |
| 1 | | that.   Because if, if, ah, if they're |
| 2 | | not doing their job downtown like |
| 3 | | they're supposed to be doing, ah, I'm |
| 4 | | probably in a better position to get 'em |
| 5 | | to do it than you are.  Okay?  Ah, |
| 6 | | because, ah, uhm, because I know the |
| 7 | | people there.  And another reason by |
| 8 | | virtue of my position.  In other words, |
| 9 | | you're somebody calling, ah, that's a |
| 0 | | vendor and I'm somebody on the staff. |
| 1 | | Ah, but, the big thing is, is, is I |
| 2 | | don't want you bothering BJ.  Okay? |
| 3 | | And, ah, ah, because she's got too much, |
| 4 | | she doesn't have the staff to do it. |
| 5 | | We're trying to increase the staff, |
| 6 | | we're trying to get more, ah, |
| 7 | | coordinators, uhm, do you have any |
| 8 | | questions so far? |
| | | |
| 9 | SKRZYPEK | (UI). |
| | | |
| 0 | MAERZ | Okay. |
| | | |
| 1 | | (UI). |
| | | |
| 2 | MAERZ | The new contracts that are gonna come |
| 3 | | out, ah, I don't know exactly what |
| 4 | | they're gonna look like, I'll tell you |
| 5 | | this, they will have some penalty |
| 6 | | provisions in 'em.  Uhm, ah, but that's |
| 7 | | about all I can tell you.  (UI) anything |
| 8 | | else might change.  So, ah, I don't know |
| 9 | | what's gonna come out of those lawyer's |
| 0 | | offices anyway.  Ah, but these are, |
| 1 | | these are the big things... |
| | | |
| 2 | SKRZYPEK | Do you have any idea (UI)? |
| | | |
| 3 | MAERZ | (UI) that, if they were to come out with |
| 4 | | this, ya know, when I, when I expected |

5

|  |  |
|---|---|
|  | them we wouldn't be having this particular kind of conversation. We'd be talking about the contract provision, but in the meantime, the new guy is coming in and he's all over my ass on this. Ya know, he's hollering at me, ah, when the word, and then it didn't have anything to do with you, when the word came that another company that the guards were gonna walk off. I mean, he's, he's up chewing on my ass. |
| SKRZYPEK | Right. Yeah. |
| MAERZ | And making it very clear to me that he's not gonna tolerate that. And that's when he said, (UI) ya know, I, he's saying, you got a plan? I said, yeah, I got a plan. Ya know, I have to replace it with some of our own people and that's when he told me, he said, if you have to do that, you charge the companies for 'em, for that, whatever it costs us to replace until, until you send, send the people. The thing is you can't send the same people back that left. Okay? So, you gotta find somebody else and that's gonna take ya some time. And, ah, and, ah, in the meantime I've got either the police there or I've got CHA security force. Now I know that I'm not gonna be able to cover every post like that for the, for all of the posts that we got, not just yours. And there are some of them are gonna be vacant, that I'm not gonna do it, but those that I can do, I will. There's was a, there was another thing I wanted to (UI). |
| DAVIS | Uhm, incident reports. |
| MAERZ | Oh. We seem to be having a lot of problems on getting incident reports out of Federal. And, and I remember when, ya know, when I was Inspector General we seemed to have that problem, too, uhm, ah, why don't we, to avoid a confrontation on this issue, I would really appreciate if you could see that we get the incidents reports. |

6

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>0<br>1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>0<br>1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>0<br>1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>0<br>1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>0<br>1<br>2 | |

SKRZYPEK    I have, uhm, instructed my staff that as soon as incident reports put back in (UI) sometimes, ah, the reports, ah, either still out in the field, they have not been, ah, brought back to our control center, and I have had not, not had an opportunity to read them or review them prior to them signing off. One of the largest and major incidents that precipitated the fact that I must approve any paperwork coming out of the office and not leave this to subordinates is a very serious incident that we had, ah, I think it was last year or, ah, it had to be a year to eighteen months ago, and one of our commanders they received a call reportedly from a CNA official and that particular official instructed the commander to list the buildings that he had that were abandoned, excuse me, not abandoned, that were with only one particular individual on a post. The individual calling had told him we know of three right now that are completely abandoned, so please put 'em down. He went ahead listed the buildings as abandoned, sent the communication to Contract Security and it wound up in the chairman's hands. Subsequent to the investigation, we not only found out that the buildings were not abandoned, but they had the full contingency of personnel. He not only was chastised disciplined, but he was instructed and all personnel were instructed that not one single paper will go out of this office without my approval. And that simply is a safeguard, not only to you, but also to myself because as I understand it, the chairman was extremely vocal about it, and this precipitated that incident and he was called on the carpet and it was probably one of the most serious incidents that I had here and no one could remember who said what to who and I said, time out, fellas, now listen, this is not a way to run a railroad. You do things in succession in an organization in order of chain of command. You all police officers (UI) police officers that I

7

| | | |
|---|---|---|
| 1 | | spent twenty three years in the police |
| 2 | | department. As a patrolman I don't take |
| 3 | | a piece of paper and put it in the fax |
| 4 | | machine and send it to the, to a, to an |
| 5 | | outside agency. This must be approved |
| 6 | | by the chain of command. (Coughs). |
| 7 | | What I will do, and I promise you this, |
| 8 | | that I will do my utmost when I receive |
| 9 | | a request for (UI) I will expedite this |
| 0 | | quickly as possible. It's nothing (UI) |
| 1 | | I'm (UI) jamming or trying to withhold |
| 2 | | information, but you think you can |
| 3 | | understand my position after this |
| 4 | | incident occurred. |
| 5 | DAVIS | Well, I, I said that's it. |
| 6 | SKRZYPEK | I need to look at what is going out of |
| 7 | | this office because it's on my |
| 8 | | letterhead and I have, ah, an |
| 9 | | underlining liability for anything that |
| 0 | | goes out, that must seen by myself. I |
| 1 | | can't even comment on the document |
| 2 | | unless I know what it's about. |
| 3 | DAVIS | Right. Right. Do you mind? |
| 4 | MAERZ | Go ahead. |
| 5 | DAVIS | But again, there are times where |
| 6 | | incidents have occurred where we can |
| 7 | | call someone (UI) I have to report it to |
| 8 | | the proper (UI). |
| 9 | SKRZYPEK | I understand. |
| 0 | DAVIS | And you, you know, it just goes all |
| 1 | | (UI). |
| 2 | SKRZYPEK | But we're, we're... |
| 3 | | (UI). |
| 4 | SKRZYPEK | ...(UI) is correct, what I'm giving you |
| 5 | | are not correct and you give it to him. |
| 6 | | Yeah, but see he's (UI). |
| 7 | MAERZ | Wait, wait, wait a minute, what we're |
| 8 | | talking about is, is reasonable time. |
| 9 | SKRZYPEK | Oh, I agree with you, you know? |

8

| | | |
|---|---|---|
| 1<br>2 | MAERZ | I mean I'm not gonna tell you how to, how to manage your business. |
| 3 | SKRZYPEK | Right. |
| 4<br>5 | MAERZ | Okay?  But, ah, I mean, if everything's gotta go through one person... |
| 6 | DAVIS | Yeah, that's... |
| 7<br>8 | MAERZ | ...Ya know, it gets, it gets to be sort of a log jam thing. |
| 9 | SKRZYPEK | Right. |
| 0<br>1<br>2 | MAERZ | I would, I would think that there might be one other person, 'cause I mean, you might be on vacation or something. |
| 3<br>4<br>5 | SKRZYPEK | Well, what, what I usually do is leave it up to our vice-president, ah, either, ah, Mr. Perez or Mr. Short (ph). |
| 6<br>7 | DAVIS | (UI) and they don't call me back sometimes. |
| 8<br>9 | SKRZYPEK | They are going to get instructed today to call you back immediately. |
| 0 | DAVIS | That's fair enough. |
| 1<br>2<br>3<br>4 | SKRZYPEK | And please, even if, if I'm not even near a fax machine and you can tell me what it, what this is about in twenty five words or less... |
| 5 | MAERZ | Yeah. |
| 6 | SKRZYPEK | ...Go ahead and send it. |
| 7 | MAERZ | Yeah. |
| 8<br>9<br>0<br>1<br>2 | SKRZYPEK | But if it's something not, not true, I vowed that day forward that this will never ever, ever, ever happen again 'cause it came right down from the chairman and he was totally... |
| 3 | MAERZ | No. |
| 4 | SKRZYPEK | ...Totally outraged and it was... |

9

| | | |
|---|---|---|
| 1 | MAERZ | (UI) I understand (UI). |
| 2 | SKRZYPEK | ...Something that I let slip through the |
| 3 | | cracks and I gave too much authority, |
| 4 | | when somebody can take a, a memo that |
| 5 | | says Federal Security and put it there |
| 6 | | and what you've got are factual |
| 7 | | statements, wait a minute, it comes from |
| 8 | | my office before it is released... |
| 9 | MAERZ | Alright. |
| 0 | SKRZYPEK | ...I have an underlying liability to |
| 1 | | answer (UI)... |
| 2 | MAERZ | No, I, listen... |
| 3 | SKRZYPEK | But I'm not here to logjam ya.  It'll be |
| 4 | | done.  It'll be done. |
| 5 | MAERZ | Alright.  Listen, I can understand |
| 6 | | getting scorched.  Ya know, because it, |
| 7 | | I think it's happened to all of us. |
| 8 | DAVIS | Yeah. |
| 9 | MAERZ | And, and, and, ya know, then, ah, you... |
| 0 | SKRZYPEK | You learn your lesson. |
| 1 | MAERZ | ...You be sure to keep the flame. |
| 2 | SKRZYPEK | You learn your lesson. |
| 3 | MAERZ | Boy, but then, you know, you, you gotta |
| 4 | | be careful you don't go beyond the point |
| 5 | | of diminishing returns on (UI). |
| 6 | SKRZYPEK | This particular incident could of, could |
| 7 | | have taken place from possibly even |
| 8 | | someone in, on this department or |
| 9 | | somebody... |
| 0 | MAERZ | Yeah, (UI). |
| 1 | SKRZYPEK | ...Ah, another competitor that thought |
| 2 | | they were funny in doing this.  And, and |
| 3 | | what he did is he bit and he took the |
| 4 | | bait.  And what, what, what the result |
| 5 | | was it was a catastrophe. |
| 6 | UNKNOWN MALE (U/M) | It certainly was. |

10

| 1 | MAERZ | Okay. |
| 2<br>3<br>4 | DAVIS | Uhm, one other thing director (UI).<br>Jim, all of you guys are supposed (UI)<br>have you driven down (UI)? |
| 5 | SKRZYPEK | Yes, I have. |
| 6 | DAVIS | Have you seen them? |
| 7<br>8<br>9<br>0<br>1<br>2 | SKRZYPEK | I've seen guys outside of, of the door<br>and that's why this is carried with me<br>twenty four hours a day and I'll call<br>the supervisor and order those guys back<br>into the building.  I have an officer<br>shot, ah, was it last week? |
| 3 | U/M | Un huh. |
| 4 | KOZAK | Ah, a lieutenant. |
| 5 | MAERZ | Yeah. |
| 6<br>7<br>8<br>9<br>0<br>1<br>2<br>3<br>4 | SKRZYPEK | And I, I've given three (UI) no matter<br>how warm it is, and have gone over the<br>radio continuously no matter how warm it<br>is, stay inside the buildings.  Don't,<br>you are not to be outside the doors.  I<br>realize it's hot, but it's more<br>uncomfortable to have a bullet inside of<br>you than to be standing outside and just<br>being uncomfortable from the weather. |
| 5 | MAERZ | Yeah. |
| 6<br>7<br>8<br>9<br>0<br>1<br>2<br>3<br>4<br>5<br>6 | SKRZYPEK | Okay?  So, my, my presence is well known<br>and I bark on that thing continuously<br>and you know, you do have incidents and<br>I, and I do agree with you, there are,<br>when I confront 'em, well, I was only<br>going to the washroom, there's no<br>washroom in the building, I had to<br>relieve myself, and it's a constant,<br>constant back and forth, and we're<br>trying to keep the lid on it as much as<br>we can. |
| 7<br>8<br>9 | DAVIS | You know because I see them, I see them<br>in restaurants and down State Street.  I<br>seen them in McDonald's... |

11

| | | |
|---|---|---|
| 1<br>2 | SKRZYPEK | Whenever that's done, they're severely, severely disciplined. |
| 3<br>4 | DAVIS | Usually what I do is call, uh, uh, forty second street office... |
| 5<br>6 | SKRZYPEK | If that occurs, please let me know immediately. |
| 7 | DAVIS | Yeah. |
| 8 | SKRZYPEK | We try our best. |
| 9<br>0<br>1<br>2<br>3<br>4<br>5 | DAVIS | Okay.  Ah, that's about, that's about, well, you, you, I just, I just wanna go back, for just a half a second, and, and share something with you.  When you, when you're backlogged with, with your invoices, then I have to give my staff overtime. |
| 6 | SKRZYPEK | Okay. |
| 7 | DAVIS | So... |
| 8<br>9<br>0<br>1<br>2<br>3 | SKRZYPEK | Which you're proving, Oh, oh, my confession to you and everybody (UI) that I've said it, I can't balance my checkbook.  If Janice wasn't here, I'd be in foam rubber city right now, bouncing off the walls.  I can't do it. |
| 4 | | (LAUGHING) |
| 5 | U/M | Foam rubber city. |
| 6 | SKRZYPEK | I can not (UI) right now... |
| 7 | MAERZ | Janice, Janice is your wife? |
| 8 | SKRZYPEK | Janice is my wife. |
| 9 | MAERZ | Oh, okay. |
| 0<br>1<br>2<br>3<br>4<br>5<br>6<br>7 | SKRZYPEK | If, if, she knows where every dime and every penny is, and if a guy calls her six months ago and says, listen, you didn't put twenty dollars in my check, she knows it right to the penny, because she's got a trap mind.  She's working, she's been working in banking and she knows this.  I only say, look, they're, |

12

| | | |
|---|---|---|
| 1 | | they're calling me, they're hot on this, |
| 2 | | can you speed this thing up?  And |
| 3 | | whatever she does and however she does |
| 4 | | it, ah... |
| 5 | DAVIS | Normally it's not Jim or Jan didn't |
| 6 | | call.  Well, Jan calls every once in a |
| 7 | | while about them invoice, but Perez. |
| 8 | SKRZYPEK | Perez.  You'll never see me calling |
| 9 | | about invoices or anything 'cause I |
| 0 | | don't... |
| 1 | DAVIS | No. |
| 2 | SKRZYPEK | ...What the hell I'm doing.  I'm an |
| 3 | | operations man.  I'm out in the field. |
| 4 | MAERZ | (UI) Ordinarily, and I'm not asking you |
| 5 | | to conform with what other companies are |
| 6 | | doing.  But, ordinarily, you know, we |
| 7 | | get billings from them every pay period. |
| 8 | | And, ah, and, ah, some of them I think |
| 9 | | are not in as good as fiscal condition |
| 0 | | as you are, and, ah, ah, so, it, it can |
| 1 | | hurt them, too, when they have... |
| 2 | SKRZYPEK | I understand that.  And you're right |
| 3 | | about the earlier comments, it's... |
| 4 | MAERZ | But the big thing is... |
| 5 | | Is not fair. |
| 6 | MAERZ | ...Is, is we wanna, we wanna provide you |
| 7 | | with the service, too, I mean, we don't |
| 8 | | want you to, to, to wait three months to |
| 9 | | get paid. |
| 0 | SKRZYPEK | No, no. |
| 1 | MAERZ | But then again, don't wait three months |
| 2 | | to bill us either.  Okay? |
| 3 | DAVIS | And, and whoever you have checking your |
| 4 | | invoices to make sure they don't use |
| 5 | | people that are on the barred list. |
| 6 | MAERZ | That they don't what? |
| 7 | DAVIS | Use persons that are on the barred list. |

13

| | | |
|---|---|---|
| 1 | MAERZ | Oh, yeah. |
| 2 | DAVIS | (UI).  Which you get every month, Jim? |
| 3 4 5 | SKRZYPEK | Yeah, definitely.  That's distributed. 'Cause every time we get it, it is distributed all over the the company. |
| 6 7 | MAERZ | Yeah, watch, watch your, ah, watch your time sheets.  Okay? |
| 8 | SKRZYPEK | Alright.  Thanks (UI). |
| 9 | | (UI) on a, ah... |
| 0 | | (UI). |
| 1 | | (STATIC) |
| 2 | | (UI) pay (UI). |
| 3 | | (LAUGHING) |
| 4 | | (UI)  Yeah, (UI) yeah.  Thanks. |
| 5 6 | SKRZYPEK | Thanks a million.  (UI) mention (UI). Thanks (UI). |
| 7 | | (UI). |
| 8 | SKRZYPEK | Yeah, thanks a million. |
| 9 | | (UI). |
| 0 | | (STATIC) |
| 1 | U/M | (UI).  He's got the Lexus. |
| 2 | SKRZYPEK | One hundred to one oh two, (UI). |
| 3 | KOZAK | There he is. |
| 4 | SKRZYPEK | Oh. |
| 5 | KOZAK | Here he is. |
| 6 7 8 | SKRZYPEK | (STATIC)  Rick, a pleasure (UI) I appreciate everything you are doing (UI). |
| | | (STATIC) |

14

1                          (MUSIC PLAYING)


2        (CONVERSATION TERMINATED)

3        KOZAK              The time is 3:38.  The meeting has
4                           concluded and I am going to shut the
5                           recorder off.

15

DATE:                    10/17/94
TIME:                    ON:  11:45 A.M.
                         OFF: 11:48 A.M.
ACTIVITY:                TELEPHONIC MONITORING

SPEAKERS:
    KOZAK:               RICHARD KOZAK
    KRZYPEK:             JAMES R. SKRZYPEK
    UF:                  UNKNOWN FEMALE

              *      *      *      *      *

1  SA JOHN SHOUP          This is Special Agent John Robert
2                         Shoup of the Federal Bureau of
3                         Investigation.  Also in the presence
4                         of Special Agent Tim Heppermann I'm
5                         here with Richard Kozak who is going
6                         to place a telephone call to Jim
7                         Skrzypek of Federal Security at
8                         telephone number (312) 774-7002.  The
9                         date is October seventeenth, 19 94.
10                        The time is eleven - forty-five a.m.

11                        (Dial tone)

12                        (Phone dialing)

13                        (Phone ringing)

14 UF                    Federal.

15 KOZAK                 Hi, Jim Skrzypek please.

16 UF                    Who's calling?

17 KOZAK                 Rick Kozak.

18 UF                    Rick...Rick Hozak (ph)

19 KOZAK                 Kozak.

20 UF                    Hold on a second, okay?

21 KOZAK                 Okay.

22                        (Pause in conversation)

23 SKRZYPEK              Skrzypek.

                                            "EXHIBIT 5"

                    1

| | | |
|---|---|---|
| 1 | KOZAK | Jim. |
| 2 | SKRZYPEK | Yeah. |
| 3 | KOZAK | Rick Kozak. |
| 4 | SKRZYPEK | Hey Rick, how you been? |
| 5 | KOZAK | Alright, how are you? |
| 6 | SKRZYPEK | What's goin' on? |
| 7 | KOZAK | I got a little problem. |
| 8 | SKRZYPEK | Yeah. |
| 9 | KOZAK | Ahhhm, I...I just saw Jose .. |
| 10 | SKRZYPEK | Okay. |
| 11 12 | KOZAK | ...and uh, I talked to him last week too... |
| 13 | SKRZYPEK | Okay. |
| 14 15 | KOZAK | ...uhm, this uh, this check for Nancy... |
| 16 | SKRZYPEK | Okay. |
| 17 18 19 20 | KOZAK | ...the...you know, I'm...I'm gettin' a little bit of uhm, uh, she's not bein' paid uh, what was originally agreed upon. |
| 21 | SKRZYPEK | Nancy is who? |
| 22 23 | KOZAK | Nancy is my girlfriend who's on...on the payroll. |
| 24 | SKRZYPEK | She's on the payroll? |
| 25 | KOZAK | Yes. |
| 26 27 | SKRZYPEK | (Inaudible) with uh, when did...when did she start? |

2

| | | |
|---|---|---|
| 1 | KOZAK | (Stutters) This is per Jose. She started uh, 'bout uh, two months ago. |
| 3 | SKRZYPEK | Holy fuck. I wish somebody'd tell me somethin' (laughs). |
| 5 | KOZAK | Yeah. |
| 6 | SKRZYPEK | I wish somebody would uh, let me know what's goin' on. Uhh, was there a dispute in the pay or somethin'? |
| 9 | KOZAK | Yeah. Yeah. |
| 10 | SKRZYPEK | Uh, why don't I do this, uh, Rick, let me get a hold of uh, him or Janice and where are you at? What number are you at? |
| 14 | KOZAK | I'm in the office. |
| 15 | SKRZYPEK | Hold on a second Rick, hold on. (Inaudible) go ahead with it. Go ahead with you number. |
| 18 | KOZAK | Three two si...uh, it's three one two. |
| 20 | SKRZYPEK | Yeah. |
| 21 | KOZAK | Three two six. |
| 22 | SKRZYPEK | Three two six. |
| 23 | KOZAK | Two seven two seven. |
| 24 | SKRZYPEK | Two seven two seven. |
| 25 | KOZAK | Just ask for me, I mean, I...I don't have a direct number. |
| 27 | SKRZYPEK | Yeah, no, no problem Rick. Let me find out what the...what the fuck is goin' on. I wasn't even aware she was workin' for me. Let me uh, let me call him. |

3

| | | |
|---|---|---|
| 1 | KOZAK | Alright, thanks. |
| 2 | SKRZYPEK | Bye. |
| 3 | KOZAK | Bye. |
| 4 | | (Conversation terminated) |
| 5 | SA SHOUP | This is Special Agent John Robert |
| 6 | | Shoup.  That concludes the call.  The |
| 7 | | time is 11:48 a.m.  The file number |
| 8 | | is 147A-CG-92714. |

4*

Q-1

```
DATE:                 10/19/94
TIME:                 ON:   9:45 A.M.
                      OFF:  9:48 A.M.
ACTIVITY:             TELEPHONIC MONITORING

SPEAKERS:
    PEREZ:            JOSE PEREZ
    SKRZYPEK:         JANICE SKRZYPEK
    SHOUP:            SA JOHN SHOUP
```

                        *        *        *        *

| | | |
|---|---|---|
| 1 | SHOUP: | This is Special Agent John Robert Shoup |
| 2 | | of the Federal Bureau of Investigation, |
| 3 | | I'm here with, also in the presence of |
| 4 | | Special Agent Terry Moody, I'm here with |
| 5 | | Jose Perez, who's going to place a |
| 6 | | telephone call to Janice Skrzypek at |
| 7 | | telephone number 312/607-9094.  The date |
| 8 | | is October 19, 1994, the time is 9:48 |
| 9 | | a.m. |
| 10 | | (PHONE RINGING) |
| 11 | SKRZYPEK: | Hello. |
| 12 | PEREZ: | Hi boss, |
| 13 | SKRZYPEK: | Hi baby. |
| 14 | PEREZ: | How are you? |
| 15 | SKRZYPEK: | Fine. |
| 16 17 | PEREZ: | Good.  Uh, listen I just had a meeting with Kozak. |
| 18 | SKRZYPEK: | Yeah. |
| 19 | PEREZ: | He's fucking pissed off. |
| 20 | SKRZYPEK: | Why? |
| 21 | PEREZ: | Uh, he wants an increase. |
| 22 23 | SKRZYPEK: | Uh, lets not talk about this over the phone sweetheart. |
| 24 | PEREZ: | Okay, sorry. |

1                          "EXHIBIT 1"

| | | |
|---|---|---|
| 1 | SKRZYPEK: | Okay. |
| 2 | PEREZ: | Okay. Uhm, can we meet tonight? |
| 3 | SKRZYPEK: | Yeah, uhm, where are you now? |
| 4 5 | PEREZ: | I just finished meeting with him, I'm on my way to the office. |
| 6 7 | SKRZYPEK: | Okay, alright, you know you got all those men there for the funeral. |
| 8 | PEREZ: | Yeah, shit it's almost there. |
| 9 | SKRZYPEK: | Okay. |
| 10 11 | PEREZ: | Okay, I'll call them right now so they can send 'em over. |
| 12 13 14 | SKRZYPEK: | Okay, you know what? I'm taking Tony to the, uhm, Ernie's pickin' up Tony right now. |
| 15 | PEREZ: | Okay. |
| 16 17 | SKRZYPEK: | And we're, uhm, I'm almost to the hospital because I got. |
| 18 | PEREZ: | What happened? |
| 19 20 | SKRZYPEK: | No, no, no Tony's just going for a checkup. |
| 21 | PEREZ: | Okay. |
| 22 | SKRZYPEK: | At St. Lukes. |
| 23 | PEREZ: | Okay. |
| 24 25 26 | SKRZYPEK: | So I can probably meet you after that if you want to, if you got what twenty minutes to spare. |
| 27 | PEREZ: | Fine, fine. |
| 28 | SKRZYPEK: | Okay? |
| 29 | PEREZ: | No problem. |
| 30 31 32 | SKRZYPEK: | Uhm, so just stick around because all you got to do is hop on the expressway and you can come straight down, uh. |

2

| | | |
|---|---|---|
| 1. | PEREZ: | No problem. |
| 2 | SKRZYPEK: | Okay? |
| 3 | PEREZ: | Give me a page. |
| 4 | SKRZYPEK: | You got it. |
| 5 | PEREZ: | Bye. . . |
| 6 | SKRZYPEK: | Bye. |
| 7 | | (CONVERSATION TERMINATED) |
| 8 | SHOUP: | This is John Robert Shoup that concludes |
| 9 | | the call. The time is 9:45 a.m. File |
| 10 | | number is 147A-CG-93714. |

3

# EXHIBIT   7





Home | Member Services | Home Delivery | Site Map | Archives | Print Edition | Advertis

Hi, jimmyskrips
@ Member Services
> Logout

February 1, 2004

→ E-mail story   Print   a d

Freeway Watch
Check your commute

MARKET PLACE
Classifieds and more

career**builder**    find a job
                     post a job

cars.com    find a car
            sell a car

HOMES    find a home
         sell a home

apartments.com    find an apt.
                  list an apt.

VALENTINE
GIFT & ACTIVITY GUIDE
lavalife    find a date

calendarlive.com
Art, Theater, Night Life
Movies, Music, TV, Dining

**The World**
**The Nation**
**California / Local**
**Business**
**Politics**
**Sports**
**Travel**
**Editorials, Op-Ed**
**Sections**
Arts & Entertainment
Books
Chess
Columns
Education
Environment
Food
Health
Highway 1
Home
Kids' Reading Room
Magazine
Obituaries
Outdoors
Real Estate
Religion
Science & Medicine
Style & Culture
Sunday Opinion
Technology
Times Poll
Corrections

**Editions**
Print Edition
National (PDF)
Wireless
**Extras**
College Connection
Sweepstakes
Crossword

# Even Prosecutors Sought Pellicano for His Expertise

■ The 'audio forensics' specialist, now in prison, has been called a genius, but he's had doubters.

By Scott Glover and Matt Lait, Times Staff Writers

Anthony Pellicano, the famed Hollywood private eye, was fond of saying he would go to great lengths to solve his celebrity clients' problems — even if it meant whacking somebody with a baseball bat or resorting to blackmail.

He cultivated an aura of danger, boasting that he knew how to shred someone's face with a knife.

Yet for three decades, prosecutors across the country had no hesitation about using him as an expert witness in dozens of cases. Despite his unsavory image and win-at-all-costs reputation, Pellicano, who is now serving time for possession of illegal explosives, built a lucrative career as an "audio forensics" expert, analyzing and enhancing tape recordings.

Interviews and court documents show that prosecutors often turned to Pellicano to examine disputed evidence in troubled cases. In some instances, he vouched for the authenticity of tape recordings that defendants said had been altered.

In others, he enhanced garbled or faint recordings after other experts, including those at the FBI, were unable to do so.

In one such case, the U.S. attorney's office in Tampa, Fla., hired Pellicano to enhance recordings that were the key evidence against a couple suspected of killing their baby daughter. Pellicano said he heard incriminating utterances by the parents, including a comment by the mother that the child "died real bad."

But after listening to the tapes, a federal judge said they were worthless as evidence.

"I heard none of it," said U.S. District Judge Steven D. Merryday, who later awarded the couple nearly $3 million in attorneys' fees after the federal government conceded that charges never should have been filed.

Pellicano also served as a prosecution expert in the high-profile trial of Thomas Blanton Jr., accused in a 1963 church bombing in Alabama that killed four African American girls. Pellicano produced enhanced tape recordings and a transcript that bolstered the government's case.

Then-U.S. Atty. G. Douglas Jones said Pellicano's analysis was instrumental in convicting

**Photos**



Anthony Pellicano
(George Wilhelm / LAT)

**Times Headlines**

more >

SUBSCRIBE to the
Los Angeles Times.
click here

ARCHIVESACCESS
Click any related topic(s)
below to access free
abstracts of Archives articles.
AUDIO RECORDINGS
PRIVATE DETECTIVES
PRIVATE DETECTIVES
EXPERTS AUDIO
RECORDINGS WITNES
EXPERTS
PELLICANO ANTHONY
WITNESSES

Enter phrase:                GO!

ProQuest Archiver

Horoscope
Lottery
Multimedia
Traffic
Weather
Week in Focus
**Archives**
Enter Keyword(s): 

**Detailed Search**
**SITE MAP**

Los Angeles Times

**HOME DELIVERY**

· Subscribe
· Manage My Account
· Gift Subscription
· College Discount
· Mail Subscriptions

**IN THE COMMUNITY**

· Times in Education
· Reading by 9
· LA Times Books
· Student Journalism
· LA Times Family Fund
· Times-Mirror Foundation
· LA Times Events

**MEDIA CENTER** CLICK HERE
**About The Times**

**PLACE**
classifieds and more

· Careers
· Cars
· Homes
· Rentals
· Newspaper Ads
· Personals
· Times Guides
· Recycler.com

**Partners**



Blanton in 2001.

**Well-Paid as a Witness**

Over the years, Pellicano collected as much as $350 an hour from the government and was paid tens of thousands of dollars in some cases.

Now, his career as a prosecution expert is almost certainly over.

On Jan. 23, he was sentenced to 30 months in federal prison after pleading guilty to possession of illegal explosives. Federal agents found plastic explosive and a pair of hand grenades in his Sunset Boulevard office. They were searching for evidence of his involvement in a plot to frighten a Los Angeles Times reporter into abandoning a story on movie star Steven Seagal.

Pellicano, 59, is also at the center of a federal investigation into allegations of illegal wiretapping of entertainment industry figures.

Even before his recent legal problems began, Pellicano's background should have raised red flags for prosecutors, according to legal scholars and former government attorneys. Even cursory research would have turned up media accounts in which he boasted about or was accused of thuggish or illegal behavior.

For instance, in a January 1992 profile in GQ magazine titled "The Big Sleazy," Pellicano bragged that he had used a baseball bat to beat up one of his client's adversaries and had blackmailed others.

"I'm an expert with a knife," he was quoted as saying. "I can shred your face with a knife."

Although some defense attorneys and civil litigators are known to shop for experts whose testimony will favor their cases, prosecutors are supposed to operate under stricter ethical guidelines.

"Prosecutors have a duty to seek justice, not just find an expert who supports their case and gets them a win," said USC law professor Erwin Chemerinsky, who teaches legal ethics.

Former U.S. Atty. James P. Walsh, who prosecuted one celebrated case in which Pellicano was a defense expert — the 1984 cocaine-trafficking trial of automaker John Z. DeLorean — said he was stunned to learn that Pellicano had gone on to work for prosecutors.

"I find that surprising almost to the point of unbelievable," said Walsh, now in private practice in Los Angeles. While examining government tape recordings in the DeLorean case, he said, Pellicano got into a scuffle with an FBI agent and damaged the evidence.

"I'm blown away prosecutors would use him," Walsh said.

Pellicano declined requests for an interview through his attorney, Donald M. Re.

Re said Pellicano had "long been recognized by defense lawyers and prosecutors as a leading expert in tape analysis. It's unfortunate that some people would attack him now, but it is the nature of jackals to attack when a person is down."

Before he was arrested on the explosives charges, many prosecutors were full of praise for Pellicano, as evidenced by a stack of letters in his court file. Re had presented the letters as evidence of Pellicano's good character in arguing that he should be released on bail.

One was from Jones, then U.S. attorney for the Northern District of Alabama, who hired Pellicano in the church bombing case.

**40-Year-Old Audiotape**

Pellicano enhanced a nearly 40-year-old reel-to-reel audiotape on which Blanton, a former Ku Klux Klansman, allegedly was heard telling his wife about a meeting to plan the bombing of Birmingham's 16th Street Baptist Church.

"Although the FBI worked with these tapes, I was not completely satisfied with the result and contacted you," Jones wrote Pellicano in May 2001. "Through your tireless efforts we were able to produce to the jury an audible recording of a critical conversation in which the defendant clearly admitted his involvement in this horrible crime."

On the enhanced tape, Blanton is heard telling his wife, Jean: "We had that meeting to make the bomb."

Pellicano also made a key discovery that assisted the prosecution. Jones had feared that the taped conversation might not be admissible in court because it was between a husband and wife. Pellicano detected what he contended was a third voice on the tape. That was significant because the so-called marital privilege does not shield a conversation involving a third party.

Blanton, now in his 60s, was convicted of murder and sentenced to life in prison. After the explosives charges against Pellicano attracted wide publicity, Blanton's lawyer asked for a hearing on the investigator's role in the church bombing case. A court ruling is awaited.

In an interview, Jones said he had no concerns about Pellicano's work on the case. But he said he would not have hired him had he known more about his background. "As I sit here today, no way," said Jones, now in private practice in Birmingham.

In another case, a Los Angeles County prosecutor enlisted Pellicano's help in an attempted-murder case after learning that the defense would contend that a detective had altered a key audiotape.

On the tape, the defendant was allegedly heard bribing the victim not to testify. Pellicano examined the tape and the equipment used to record it, and vouched for the accuracy of the recording. The defendant was convicted and sentenced to 32 years to life.

"Your quick response convinced the defense to completely abandon their tampering claims," Stephanie Wilson, then a deputy district attorney, wrote Pellicano on April 8, 1999. "Thank you again for your willingness to come to our rescue at the eleventh hour."

James D. Dutton, a prosecutor with the state attorney general's office, sought Pellicano's help with the retrial of a San Diego State student accused in the 1996 killing of a surfer. The case had been damaged when a county prosecutor said a colleague coached a key witness to lie. Pellicano was brought in to deal with further claims of prosecution misconduct.

One side of a tape-recorded interview with another important prosecution witness was inexplicably blank. Pellicano offered a theory as to how the detective could have accidentally pushed "play" instead of "record," resulting in the blank side.

In August 2000, a jury convicted the defendant of involuntary manslaughter.

"The defense attempted to show that the blank side of the audiotaped interview was part of a law enforcement/district attorney's office conspiracy to conceal exonerating evidence," Dutton wrote Pellicano a month later. "Thanks to your tireless efforts ... we were able to present an explanation."

Orange County Deputy Dist. Atty. Elizabeth Henderson said Pellicano's analysis of a grainy security video was key to convicting a gang member in the 1995 murder of a 7-Eleven clerk in La Habra.

The defendant's face was covered in the video and there was no admissible evidence directly linking him to the scene. Pellicano enhanced the tape and determined through what

he called "critical listening" that the defendant's crime partner could be heard saying the word "Downer" — the defendant's gang moniker.

Henderson said in a recent interview that she could not make out the man's utterance. But she was thankful that Pellicano said he could.

"I believe that your testimony regarding the content of the audiotape was critical to [the jury's] decision" to convict, Henderson wrote Pellicano on June 4, 1998. "I found your testimony.... to be fascinating, as I hope it was for the jury."

Pellicano also helped the Houston Police Department in its defense against a lawsuit by a former narcotics officer who said the department had retaliated against him for exposing misconduct. The plaintiff contended that a crucial tape recording had been altered by police.

### Found on the Internet

Constance K. Acosta, a lawyer for the city, was distressed to learn that the audio expert she had hired largely agreed with the plaintiff's lawyer that the tape had been doctored. Acosta hurriedly searched the Internet for a new expert. She found Pellicano, who helped her devise a strategy to counter the plaintiff's expert. A jury rejected the former officer's claims.

"Even though we came to you at the last possible moment for what seemed to be an insurmountable dilemma, your outstanding efforts, patience and perseverance allowed us to be successful in defending truth and justice," Acosta wrote in a Jan. 2, 2002, letter. "Many officers of the Houston Police Department owe you a sincere debt of gratitude for vindicating their honor."

In a recent interview, Acosta said that audio forensics was extremely complex and that Pellicano "helped me take the science out of it."

"I think the sun rises and sets on him," Acosta said. "He is a tough guy, but he comes across honestly. I believe the guy is a genius."

Many of the prosecutors who solicited Pellicano's help said they did not thoroughly research his qualifications. In most of the cases examined by The Times, defense attorneys also failed to question how a high school dropout became an expert in such an arcane field.

Pellicano, who grew up in Cicero, Ill., served in the Army and worked as a bill collector before becoming a private eye in Chicago. After moving to Los Angeles, he became known as an investigator to the stars, helping Michael Jackson, Tom Cruise and other celebrities deal with their legal problems.

An unabashed self-promoter, Pellicano has described himself as a screenwriter, an actor and an expert in voice recognition, typewriter analysis and martial arts. While in his late 20s, Pellicano boasted that he had investigated 3,964 missing-persons cases and solved every one.

In a resume from the 1970s, he said he had been trained by military intelligence personnel in highly sophisticated audio surveillance procedures and countermeasures.

His interest in tape recordings grew as he recognized their power as evidence. In the early 1980s, Pellicano gained national exposure for his role as a defense expert for DeLorean, who was charged with conspiracy to smuggle more than 200 pounds of cocaine into the United States.

Pellicano examined tapes of secretly recorded conversations between DeLorean and an FBI informant. One of DeLorean's attorneys said later that Pellicano's work helped secure an acquittal.

Pellicano's investigative practice and his stature as an expert grew. Though he lacked

formal scientific and educational credentials, he could afford the most sophisticated equipment.

He took out ads in legal magazines. His website touted his Sunset Boulevard lab as "the most comprehensive and state-of-the-art tape analysis laboratory in the country."

Even the FBI envied his lab, he told clients. Pellicano gave reporters tours of the facility. On one occasion in the early 1990s, he demonstrated to a Times reporter how an innocent conversation could be altered to appear incriminating or embarrassing.

Pellicano has written articles and at least one book on tape analysis. He designed a computer program for analyzing tapes called "Forensic Audio Sleuth."

By his account, he has testified as an expert in hundreds of cases. Some audio experts credit Pellicano with developing the standards used to analyze tape recordings. Pellicano himself has said he coined the term "audio forensics."

Prosecutors who hired him said Pellicano was charismatic and persuasive on the witness stand.

"He was one of the best, if not the best, witness I've ever had," said Steve Gruel, head of the major crimes division of the U.S. attorney's office in San Francisco.

One instance in which Pellicano's powers of persuasion failed was in the prosecution of Steve and Marlene Aisenberg, the Tampa couple suspected of killing or selling their baby.

The Aisenbergs reported on Nov. 24, 1997, that their 5-month-old daughter, Sabrina, had disappeared. Investigators from the Hillsborough County Sheriff's Department suspected that the parents were responsible.

There were no signs of forced entry, and the family's dog didn't bark during the night. Marlene, according to authorities, failed a lie detector test. Then the Aisenbergs hired a lawyer and began to place conditions on their cooperation with authorities.

With court approval, detectives secretly placed listening devices in the couple's home. Deputies monitoring their conversations reported that Marlene told her husband: "I hate you. I hate you for what you did to our tiny daughter."

Despite what would appear to be strong evidence, local prosecutors did not charge the Aisenbergs with murder. Instead, the U.S. attorney's office took over the case and charged the couple with making false statements and covering up the circumstances of their daughter's disappearance.

The tapes were the key evidence. Yet when defense lawyers listened to them, they said none of the supposed incriminating statements could be heard. Experts at the FBI lab in Quantico, Va., were unable to enhance the tapes. Prosecutors then sought Pellicano's help. After listening to the tapes hundreds of times, he said he could hear incriminating words and phrases, including this statement by Marlene Aisenberg: "I tried to save her. She died real bad."

As he had in other cases, Pellicano had audio-analysis equipment flown to Tampa from Los Angeles for a courtroom demonstration. "You'd swear this was a rock concert," federal Magistrate Judge Mark Pizzo quipped as he looked out at the computers and speakers.

**Credentials Questioned**

But before his demonstration began, the Aisenbergs' attorneys questioned Pellicano about his qualifications. He acknowledged that he had no scientific, mathematical or engineering education and did not understand the science underlying his findings.

Defense lawyers also told the judge that Pellicano had used an alias, had filed for

bankruptcy and once received a $30,000 loan from the son of a reputed mobster.

Todd Foster, one of the Aisenbergs' attorneys, told Pizzo that calling Pellicano an audio expert was like "saying I'm an expert in dentistry because I went out and bought a very fancy drill and I have X-ray equipment."

The judge allowed Pellicano to testify. But after listening to the tapes, Pizzo said: "The government hears what no reasonably prudent listener can. It interprets what can be heard as no reasonably prudent listener would."

Judge Merryday, who presided over the case, agreed and criticized the prosecution for paying Pellicano up to $350 an hour. He called it "a surprisingly generous rate given Pellicano's credentials, and in excess of any of the notably more reputable experts retained by the Aisenbergs."

The prosecution dropped the charges, and the Aisenbergs filed a claim under a seldom-used federal law that allows defendants to recoup their legal expenses if a prosecution was "vexatious, frivolous or in bad faith."

For the first time since the law was enacted in 1997, the government admitted liability. Merryday awarded the Aisenbergs $2.9 million last year.

The couple are seeking additional damages in a separate lawsuit. In court papers, their lawyer, Barry Cohen, has accused prosecutors of hiring Pellicano to "fabricate transcripts" and give perjured testimony.

In an interview, Cohen said the government's reliance on Pellicano was "an act of desperation.... They were going to … get this scumbag to lie for them."

Yet after the case fell apart, the top federal prosecutor for the Middle District of Florida wrote Pellicano praising his work.

"You provided outstanding forensic audio assistance, which was both comprehensive and timely," said then-U.S. Atty. Mac Cauley. "We look forward to working with you on future significant criminal matters."

If you want other stories on this topic, search the Archives at latimes.com/archives.

### TMSReprints
**Article licensing and reprint options**

Pay your Los Angeles Times bill with a mouse   CLICK HERE

Copyright 2004 Los Angeles Times
By visiting this site, you are agreeing to our **Privacy Policy**
**Terms of Service**.

U.S. District Court, District of Columbia
Nancy Mayer-Whittington, Clerk

MAY 2 4 2007

Mail Room
Received